SMITH ET AL., CONSTITUTING THE ILLINOIS
COMMERCE COMMISSION, ET AL. v. ILLINOIS
BELL TELEPHONE COMPANY.

No. 90.   Argued October 20, 21, 1930.—Decided December 1, 1930.

134

See also, 269 U. S. 531.

Messrs. *George I. Haight* and *Benjamin F. Goldstein*, with whom *Messrs. Oscar E. Carlstrom*, Attorney General of Illinois, *Samuel A. Ettelson*, Corporation Counsel, City of Chicago, and *Edmund D. Adcock* were on the brief, for appellants.

Mr. *William Dean Bangs*, with whom *Messrs. Charles M. Bracelen* and *Horace Kent Tenney* were on the brief, for appellee.

138

140

Mr. Chief Justice Hughes delivered the opinion of the Court.

This is an appeal from a final decree of the District Court, composed of three judges as required by section 266 of the Judicial Code, enjoining the enforcement of an order of the Illinois Commerce Commission which prescribed rates for telephone service in the City of Chicago, upon the ground that the order was confiscatory and hence was in violation of the due process clause of the Fourteenth Amendment (38 F. (2d) 77). The order of the Commission was made on August 16, 1923, to be effective October 1, 1923. It reduced rates for four classes of coin box service and thus applied to a large part of the intrastate service of the complainant, the Illinois Bell Telephone Company.

An interlocutory injunction, restraining the enforcement of the rates, was granted on December 21, 1923, and the order was affirmed by this Court on October 19, 1925. 269 U. S. 531. This interlocutory order was made upon the condition that, if the injunction were dissolved, the complainant should refund to its subscribers the amounts paid by them in excess of the sums chargeable under the Commission's order. The suit was not brought to a final hearing until April, 1929, and the court found that at the time of its decision (January 31, 1930) the amount thus reserved for refunds exceeded $11,000,000. The court said that the delay in bringing the case to trial was attributable to the City of Chicago and that the complainant had been ready at all times to proceed. But the decree enjoining the rates speaks from its date, and the question is necessarily presented, not only whether the order of the Commission was confiscatory when made, but also as to its validity during the period that has intervened, and as to the respective rights of the complainant and its subscribers in relation to the fund thus accumulated. *Groes-*

*beck* v. *Duluth South Shore & Atlantic Railway Company,* 250 U. S. 607, 609.

The court found that ninety-nine per cent. of the stock of the complainant, the Illinois Company, is owned by the American Telephone & Telegraph Company which also owns substantially the same proportion of the stock of the Western Electric Company; that the Illinois and American companies unite in rendering long distance service under an arrangement for a division of tolls; that at the time to which the inquiry related, in October, 1923, there was in effect an agreement by which the Illinois Company paid to the American Company 4½ per cent. of its gross revenues for rent of instruments and as compensation for enginering, executive, financial and other services; that a large part of the materials entering into the construction of the plant and equipment of the Illinois Company were purchased from the Western Electric Company and much of its operating expense consisted of payments made under a contract with that company for apparatus and supplies. The court further found that the American Company owned a controlling interest in fifteen telephone companies which, in connection with other companies controlled by those subsidiaries and some companies in which its interest was not controlling, were operated as a system with the avowed purpose of rendering a nation-wide and unified telephone service; that the American Company had stated that "the associated companies are specialists in local service problems, with local operating forces, identified and familiar with the needs of the communities they serve"; that "the parent company undertakes the solution of the problems that are common to all," and in this way there was provided a central authority equipped to perform adequately general functions, leaving to the local companies responsibility for local affairs.

Upon these facts the City attacked the standing of the Illinois Company as the real plaintiff in the case. The

court overruled this contention, holding that the owner-
ship of stock by the American Company, and its power
to control the Illinois Company, did not destroy the dis-
tinct corporate identity of the Illinois Company. The
court pointed out that the order of the Commission was
directed against the Illinois. Company, and that it was
treated as a corporation for the purpose of compelling it
to establish the prescribed rates for service furnished by
the operation of the property to which it had legal title.
No ground appears for assailing this ruling. The fact that
the relation of the Illinois Company to the American
Company may demand close scrutiny, in dealing with
certain questions which bear upon the validity of the
rate order, cannot obscure the essential basis of that order,
that is, that the Commission was imposing its require-
ment upon a corporate organization engaged in an intra-
state public service and, as such, amenable to a valid exer-
cise of the Commission's authority.

The Commission, in its final order of August 16, 1923,
made the following findings with respect to the value of
the property of the Illinois Company: That the original
cost as of December 31, 1922, of the property used and
useful in the rendering of telephone service in the City of
Chicago and exclusive of working capital, materials and
supplies, work in progress and going value, but including
overhead, was $90,687,816; that the reproduction cost
new of that property, with the same exceptions, was $128,-
769,000; that the property as it then existed was " in at
least 90 per cent condition "; that the amount of construc-
tion work then in progress, which would eventually be in-
cluded in capital account, was not more than $4,250,000;
that the amount necessary to provide a sufficient cash
working capital and to permit the carrying of sufficient
materials and supplies was $3,000,000; that the going
value of the Chicago property of the Illinois Company
was $4,196,872; that the Chicago division of the Illinois

Company had a depreciation reserve of $26,000,000 which had been contributed by the subscribers of the Company and had been used by the Company for extensions and additions to its property, and that these extensions and additions should not be considered in arriving at a base upon which to compute rates for telephone service; and that the fair rate-making base for the Chicago property of the Illinois Company, "including physical property, overhead, working capital, going value and work in progress" as thus found was $96,000,000, which was "exclusive of the $26,000,000 of money taken for depreciation reserve and put into plant and equipment." The Commission also found that on a readjustment of the account of operating expenses, and on making a fair allowance to take care of maintenance and retirement charges, the existing rates, if permitted to remain in effect for the ensuing year (1923) would afford a return of nine per cent. upon the rate-base above stated; that this was an excessive rate and that the reduced rates prescribed by the Commission would enable the Company to obtain a return of seven and one-half per cent. upon that rate base.

The court found that the original cost of the property, taking the Commission's finding of cost as of December 31, 1922, with net additions to June 30, 1923, was $101,-626,014; that the reproduction cost new, as of the latter date, was at least $145,000,000; that the finding that the property was in 90 per cent. condition was supported by the evidence, and that on this basis the reproduction cost new, less depreciation, was $130,500,000; that the amount allowed by the Commission, $4,196,067, was the minimum allowance that could be made for going value; that the valuation, or rate basis, of $96,000,000, found by the Commission as of December 31, 1922, or $106,000,000, if the net additions to June 30, 1923, were added, was clearly insufficient, and that the valuation should be not less than $125,000,000, estimating the depreciation at ten per cent.

The court held that the exclusion from the rate base of extensions and additions to the amount of $26,000,000, for which payment had been made from the Company's depreciation reserve, was erroneous; that the customers had paid for service, not for the property used to render it, that in paying for service they had not acquired any interest in the property of the Company, and that profits of the past could not be used to sustain confiscatory rates for the future, citing *Board of Public Utilities Commissioners* v. *New York Telephone Company*, 271 U. S. 23, 31, 32.

The court further found that the readjustment made by the Commission of the Company's account of operating expenses involved a reduction of $360,000 from the payment made to the American Company under the license contract, and a reduction of $1,800,000 from the annual allowance for depreciation; that the amount available for return in 1923 on the value of the property under the rates in force was $6,280,000; that if to this amount were added the above deductions on the license contract and for depreciation there would have been available for such return the sum of $8,440,000; that the reduction for the entire year under the rates established by the Commission would have been $1,700,000, thus leaving a return of $6,740,000, or less than five and one-half per cent., which was held to be confiscatory under conditions existing in 1923.

At the threshold of the discussion, we are met with the fact that, in these findings, the Commission and the court made no distinction between the intrastate and the interstate property and business of the Company. It appears that the property of the Company in Chicago is used to render (1) what is called exchange service, all of which is intrastate, (2) intrastate toll service over its own lines and under arrangements with companies other than the American Company, and (3) interstate toll serv-

ice, which includes all the toll service rendered under arrangements with the American Company. The Company introduced evidence separating the intrastate, and interstate business and also the intrastate exchange business. While the court regarded these computations as correct, and approved the method in which they had been made, still the court made no specific findings based on a separation of the intrastate and interstate property, revenues and expenses, but determined the issue on the basis of the total Chicago property of the Company.

The court stated that this was done because that basis was less favorable to the Company than that of its total intrastate property or of its intrastate exchange property. In support of this view, the court said that according to the computations of the company, one-half of one per cent. of calls originated by subscribers resulted in interstate toll calls; that 3.62 per cent of the Company's property in Chicago was used in furnishing interstate toll service, and 2.54 per cent. of its property was used in furnishing intrastate toll service; that both on the reproduction cost new, as claimed by the Company, and on the original cost, the percentage of return was greater for the total Chicago business than for the total intrastate business, and that the return for the latter was greater than for the intrastate exchange business. Considering that the difference would not affect the result, the court deemed it to be more convenient to pass upon the order of the Commission without recasting the figures in order to make allowance for interstate or intrastate toll property and earnings.

The appellants challenge this conclusion.[1] They insist that the American Company used in its long distance service, without properly reimbursing the Illinois Company, the Chicago local exchange plant, and other facili-

---

[1] In *Board of Commissioners* v. *New York Telephone Company*, 271 U. S. 23, the appellants did not raise this question (*id.* p. 30).

ties of the latter company, and that the additional net income to which the Illinois Company was properly entitled in connection with the long distance service, or that suitably taking into account the value of the property used and the expenses incurred in the long distance service and not deducted from the Chicago property and expenses, would affect the result. It is apparent that this contention can not be dismissed simply on the basis of the number of interstate calls originated by subscribers of the Illinois Company in Chicago, without considering other factors of time and labor entering into the relative use. Nor can the question be disregarded by assuming a rate of return from the total Chicago business, as compared with a rate of return from the intrastate business or the intrastate exchange business, as such an assumption would beg the point in issue.

The separation of the intrastate and interstate property, revenues and expenses of the Company is important not simply as a theoretical allocation to two branches of the business. It is essential to the appropriate recognition of the competent governmental authority in each field of regulation. In disregarding the distinction between the interstate and intrastate business of the Company, the court found it necessary to pass upon the fairness of the division of interstate tolls between the American and Illinois companies. The court held that the division was reasonable and the appellants contest this ruling. But the interstate tolls are the rates applicable to interstate commerce, and neither these interstate rates nor the division of the revenue arising from interstate rates was a matter for the determination either of the Illinois Commission or of the court in dealing with the order of that Commission. The Commission would have had no authority to impose intrastate rates, if as such they would be confiscatory, on the theory that the interstate revenue of the Company was too small and could be increased to

make good the loss. The interstate service of the Illinois Company, as well as that of the American Company, is subject to the jurisdiction of the Interstate Commerce Commission, which has been empowered to pass upon the rates, charges and practices relating to that service (Interstate Commerce Act, section 1 (1) (c), (3), (5); section 15 (1); section 20 (5)). In the exercise of this jurisdiction the Interstate Commerce Commission has authority to estimate the value of the property used in the interstate service and to determine the amount of the revenues and the expenses properly attributable thereto. By section 20 (5) of the Interstate Commerce Act, that Commission is also charged with the duty of prescribing, as soon as practicable, the classes of property for which depreciation charges may properly be included in operating expenses, and the percentages of depreciation which shall be charged with respect to each of such classes of property. The proper regulation of rates can be had only by maintaining the limits of state and federal jurisdiction, and this cannot be accomplished unless there are findings of fact underlying the conclusions reached with respect to the exercise of each authority. In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed. *Minnesota Rate Cases*, 230 U. S. 352, 435. As to the value of that property, and as to the revenue and expenses incident to that business, separately considered, there should be specific findings. *Railroad Commission* v. *Maxcy*, 281 U. S. 82, 83.

The court found that the Illinois Company owns and operates all the property in the City of Chicago used in interstate calls and connects with the property owned by

the American Company at the city limits. In the method used by the Illinois Company in separating its interstate and intrastate business, for the purpose of the computations which were submitted to the court, what is called exchange property, that is, the property used at the subscriber's station and from that station to the toll switchboard, or to the toll trunk lines, was attributed entirely to the intrastate service. This method was adopted as a matter of convenience, in view of the practical difficulty of dividing the property between the interstate and intrastate services.[2] The appellants insist that this method is erroneous, and they point tõ the indisputable fact that the subscriber's station, and the other facilities of the Illinois Company which are used in connecting with the long distance toll board, are employed in the interstate transmission and reception of messages.[3] While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential (*Rowland* v. *Boyle*, 244 U. S. 106, 108; *Groesbeck* v. *Duluth South Shore & Atlantic Railway*, 250 U. S. 607, 614) it is quite another

---

[2] On this ground, this method of separation has been approved by a number of state commissions. See Re Northwestern Bell Telephone Co., P. U. R. 1923-B, 112, 170; Public Utilities Commission *v.* New England Telephone & Telegraph Co., P. U. R. 1926-C, 207, 261; Re Hawkinsville Telephone Co., 138 Commission Leaflet (1923), 1112, 1115-1117. But compare Missouri & Kansas Telephone Co., P. U. R. 1918-C, 55; Re Southern California Telephone Co., P. U. R. 1925-C, 627; Re Chesapeake & Potomac Telephone Co. of Virginia, P. U. R. 1926-E, 481, 626; *Chesapeake & Potomac Telephone Co. of Virginia* v. *Commonwealth of Virginia*, 147 Va. 43.

[3] The Interstate Commerce Commission has had under consideration the application of section 20 (5) to the local exchange property which "is open for use in interstate commerce and at any time may be so used." Telephone and Railroad Depreciation Charges, 118 I. C. C. 295, 328-333; also Proposed Report (I. C. C.) of August 15, 1929.

matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will bear an undue burden—to what extent is a matter of controversy.[4] We think that this subject requires further consideration, to the end that by some practical method the different uses of the property may be recognized and the return properly attributable to the intrastate service may be ascertained accordingly.

Other questions are presented growing out of the relation of the Illinois Company to the Western Electric Company and to the American Company. While the Illinois Company is a distinct corporate organization, it has the advantage of being a component part of a large system to which the benefits of its operations accrue. Through this relation the Illinois Company obtains the coöperation of the manufacturing, research, engineering and financing departments of the American Company. This does not alter the fact that the Illinois business is to be treated as a segregated enterprise. If a single individual or corporation, having a number of technical staffs, engaged directly in local public services within several States, each State would be entitled to regulate the transactions within its own domain according to its own conception of public pol-

---

[4] In *Houston* v. *Southwestern Bell Telephone Co.*, 259 U. S. 318, 322, relating to the ordinance of the City of Houston prescribing telephone rates for the Company which operated not only the Houston local exchange but also long distance toll lines connecting the local exchange with various towns and cities in Texas and several other States, the Company in practice, and for the purpose of the suit, " credited the local exchange with 25% of the long-distance toll revenues received from calls originating in Houston as compensation for the use made of the local plant in rendering long distance service," and upon the facts there shown the Court held that the allowance was reasonably sufficient.

icy, provided there were no infringement of the fundamental rights guaranteed by the Federal Constitution, and, if the latter were invoked by reason of the action of any State, it would still be necessary to consider the local enterprise separately and to make whatever apportionments were necessary in that view. The corporate organization of the Illinois Company not only created a legal person amenable as such to governmental authority, but facilitates the examination of the particular transactions subject to that authority. The question presented in the present case is not one of the abuse of intercorporate relations, or of domination or control affecting the integrity of the direction of the affairs of the Illinois Company, but of alleged confiscation through prescribed intrastate rates.

Contentions of the appellants in this relation are directed to the purchases from the Western Electric Company and to the payments to the American Company under what is called its " license contract." It appears that the Illinois Company has purchased practically all its equipment from the Western Electric Company. The state commission in laying the basis for its rate order made no finding as to the fairness of the prices on such purchases. On the record in this suit, the court concluded that the City had failed to support its contention that these prices were exorbitant. The court said that it appeared that for the past fourteen years the average profit of the Western Electric Company on its total business had not been " in excess of seven per cent. and never above ten per cent." That fact has evidentiary value but the finding does not go far enough. The Western Electric Company not only manufactured apparatus for the licensees of the Bell system but engaged in other large operations and it cannot be merely assumed or conjectured that the net earnings on the entire business represent the net earnings

from the sales to the Bell licensees generally or from those to the Illinois Company. Nor is the argument of the appellants answered by a mere comparison of the prices charged by the Western Electric Company to the Illinois Company with the higher prices charged by other manufacturers for comparable material, or by the Western Electric Company to independent telephone companies. The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point.

At the time to which the evidence was primarily directed (1923), there was in force a "license contract" between the Illinois Company and the American Company, granting a license under the patents owned or controlled by the American Company and providing for the payment to the latter of 4½ per cent. of the gross revenues of the Illinois Company covering the rental for the use of instruments and for engineering, financial and advisory services. The total amount sought to be charged by the Illinois Company to operating expenses, in 1923, for payments under this contract in relation to the Chicago business was about $1,724,000. The order of the Public Utilities Commission of Illinois, made in December, 1920, which fixed the rates charged in 1923 (the rates still in force under the interlocutory injunction in

this suit) had provided that an allowance of $1.13 was reasonable solely for the use of each telephone instrument, that the services of the American Company were of great value to the Illinois Company, that the annual payment under the license contract then averaged $2.10 per station for the City of Chicago, and that this payment was not excessive.[5]  The Illinois Commerce Commission, in the order now under attack, continued this allowance of

---

[5] The Public Utilities Commission found as follows: " The record in the instant case shows that the present market price for the same instrument is $4.50 and on this basis the Commission finds that an annual allowance of $1.13 is reasonable and adequate solely for the rental of each telephone instrument.  The record shows, however, that the license to use various patented devices, the patents covering which are the property of the American Telephone and Telegraph Company, together with engineering, financial and advisory services, are of great actual value to the Chicago Telephone Company, such value being evidenced in part by the actual annual saving effected over and above the operating costs should such devices and services not be available.  The present payment made by petitioner and under the present license contract to the American Telephone and Telegraph Company averages about $2.10 per station per annum for the City of Chicago and about $1.91 per station per annum for the suburban territory.  At $2.10 per station per annum, therefore, the maximum effect upon any one rate for service cannot exceed $0.18 per station per month.  Since payment is made to the American Telephone and Telegraph Company by the Chicago Telephone Company of whose stock the former owns approximately 98%, it is necessary that the underlying contract be given scrutiny notwithstanding the fact that the Chicago Telephone Company, as a legal entity, is a free agent.  A careful consideration of the evidence in the instant case discloses the unquestioned value of the general services rendered petitioner by the American Telephone and Telegraph Company. . . .  The particular amounts involved have been approved as items of operating expense in different jurisdictions by nine Commissions within the last three years, however, and the Commission after carefully considering all the evidence is of the opinion and finds that the present annual payment under the license contract, limited to $2.10 per station per annum for the City of Chicago and to $1.91 per station per annum for the suburban territory, is not excessive and may be allowed as an item of operating expense."

$2.10 per station as sufficient to cover the rental and the services in question.[6]

The Illinois Company, in its evidence before the court, presented an estimate showing that it would have cost that Company the sum of $709,000, or $1.07 per station, during the year 1923 to provide its own supply of instruments, purchasing them in the open market and providing for a return of eight per cent. on the investment. The appellants urge that this amount is too large by $120,000, and that, in any event, the remainder of the total charge of $1,724,000 for payments under the license contract, that is, $1,015,000, treating this amount as compensation for services in addition to rentals, should be rejected. The court overruled this contention. The court found that the case for the allowance of the entire amount for services was a strong one; that on the basis of a total charge of $2.10 per station, as allowed by the state commission, there would be a reduction of $360,000 in the amount chargeable to operating expenses by virtue of the payments under the license contract, and that there was

---

[6] The finding of the Commerce Commission, after referring to the ownership of stock by the American Company, was as follows: " The Commission believes from all the circumstances surrounding the payments made by the Illinois Bell Telephone Company to the American Telephone and Telegraph Company and the services rendered by the latter to the former, and the cost thereof, should be at some time fully investigated, to the end that charges for the services may be properly established. The present record does not contain sufficient information to warrant this Commission in departing from the findings of the previous Commission in respect to the payments that should be made by the Illinois Bell Telephone Company to the American Telephone and Telegraph Company. The previous Commission found that payment by the Chicago Telephone Company to the parent company of $2.10 per station was sufficient to cover the value of the services rendered. It is certainly more equitable to base the charges for services rendered on the number of stations rather than on the gross revenue because any change in revenues results in a change in payments to the parent company, and would be made without respect to the services rendered."

no warrant for any further reduction. Without approving the reduction, the court accepted the ruling of the Commission for the purpose of determining the issue of confiscation.

It further appears that in the early part of the year 1926, the payment under the license contract was reduced from 4½ per cent. of the gross earnings to 4 per cent. This reduction was made effective as of January 1, 1926, and the reduced rate was applied in the years 1926 and 1927.[7] At the end of the year 1927, the conditions of the license contract were again changed by providing for the sale by the American Company to the Illinois Company of the telephone instruments (receivers, transmitters and induction coils) and the American Company was relieved from its obligation with respect to their replacement and repair. It is said that the price paid was substantially the current price less 20 per cent. At the same time the payment under the license contract by the Illinois Company to the American Company was reduced from 4 per cent. to 2 per cent. of the gross earnings.[8] On January 1, 1929, the

---

[7] In the Annual Report of the American Company for 1926 it was stated: "The American Telephone and Telegraph Company was able during the year to make a reduction in its charge to its Associated Companies under its contracts for service, including the furnishing of telephones. The charge was reduced from 4½ per cent. to 4 per cent. of the gross revenue of those companies, effective from January 1, 1926. The purpose of these contracts is not to make money for the American Telephone and Telegraph Company, but to further the development of the telephone art and to enable the growth and expansion of telephone service on a nation-wide basis. While the cost of furnishing the services to any one company, from the nature of the services rendered, cannot be determined, the total cost of furnishing services for all of the companies under the contracts can be approximated. The revenue of $29,850,303 received under the contracts during 1926 only slightly more than offset the estimated cost of over $29,250,000."

[8] With respect to these changes the American Company stated in its report for 1927: "As the business grows and the country

rate of payment was further reduced from 2 per cent. to 1½ per cent. of the gross earnings.

There is evidence that the payment under the license contract in the year 1924 exceeded the amount allowed by the state commission by $358,952; in 1925, by $387,284; in 1926, by $223,249; and in 1927, by $251,964. We find no similar statement for the subsequent period under the reductions of rate then applicable. In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree.

There is also the question of the annual allowance for depreciation. The Illinois Commission concluded that the accumulation of a large reserve ($26,000,000) despite the fact that the property had been maintained "in at least 90 per cent. condition," showed that the reserve had been built up by annual additions that were in excess of the amounts required. The Commission by its order pro-

---

grows, conditions change. In the early days of the telephone business it seemed essential that telephone instruments be owned and maintained by a central organization. This condition no longer obtains, and, therefore, as previously stated, the telephone instruments heretofore owned by the American Telephone and Telegraph Company were sold to the operating companies and a reduction was made in the charge for services furnished under service contracts with those companies. In 1926 this charge was reduced from 4½ per cent. to 4 per cent. of their gross telephone revenues, and this present reduction to 2 per. cent. will result in revenues to the American Telephone and Telegraph Company somewhat less than the estimated cost of performing its services under these contracts. This is, however, in accord with our efforts to assist our Associated Companies in keeping down the cost of telephone service in every way practicable."

vided for a "combined maintenance and replacement allowance" which it deemed to be adequate "to fully protect the investment in this property and permit the Company to accrue a reserve in the anticipation of property retirements." The court found that by this method the amount as charged by the Company to operating expenses in 1923 with respect to depreciation had been reduced by the Commission to the extent of about $1,800,-000. It was on the assumption of this reduction, that the court, without making any finding as to the proper annual allowance for depreciation, reached its conclusion as to the inadequacy of the rates.

While it has been held by this Court that property paid, for out of moneys received for past services belongs to the Company, and that the property represented by the credit balance in the reserve for depreciation cannot be used to support the imposition of a confiscatory rate (*Board of Commissioners* v. *New York Telephone Company, supra*), it is evident that past experience is an indication of the Company's requirements for the future. The recognition of the ownership of the property represented by the reserve does not make it necessary to allow similar accumulations to go on if experience shows that these are excessive. The experience of the Illinois Company, together with a careful analysis of the results shown, under comparable conditions, by other companies which are part of the Bell system, and thus enjoy the advantage of the continuous and expert supervision of a central technical organization,[9] should afford a sound basis for judgment as to the amount which in fairness

[9] The Interstate Commerce Commission has observed: "In devising methods for accumulating, recording, and utilizing the data essential to the ascertainment of service lives and depreciation rates, the railroad companies may well take note of the experience of the telephone companies. Much of this research and planning work has been done for the Bell System companies by a central organization of a few carefully selected engineers and accountants, and in this way

both to public and private interest should be allowed as an annual charge for depreciation.

The Company urges that, as Congress has granted jurisdiction to the Interstate Commerce Commission over the depreciation rates of telephone companies doing an interstate business (Interstate Commerce Act, section 20 (5) as amended by Transportation Act, 1920) this subject is now completely withdrawn from the power of the State. It is said that two rates of depreciation cannot be charged on the same property. The Interstate Commerce Commission has had the matter under consideration (Telephone and Railroad Depreciation Charges, 118 I. C. C. 328-333) but, so far as we are advised, a final determination has not yet been made. The Interstate Commerce Commission has its accounting rules with reference to depreciation charges and, pending its order under section 20 (5) of the Interstate Commerce Act, telephone companies, as well as others subject to the Act, have been directed to continue to observe these requirements. The Company argues that, although the Interstate Commerce Commission has not finally ruled, the action taken by Congress excludes the jurisdiction of state tribunals under familiar principles (*Northern Pacific Railway Company* v. *Washington,* 222 U. S. 370, 378; *Pennsylvania Railroad Company* v. *Public Service Commission,* 250 U. S. 566, 569; *Oregon-Washington Railroad & Navigation Company* v. *Washington,* 270 U. S. 87, 102). We are unable to assent to this view. As the Interstate Commerce Commission has not acted finally in the matter, we are not now called upon to consider the scope of its authority in relation to depreciation charges, but we are of the opinion that, in any event, until action has been

it has been done better and more economically than if each of the numerous operating companies had been left to its own initiative. The independent telephone companies have also profited from this work." Telephone and Railroad Depreciation Charges, Proposed Report of August 15, 1929, [p. 20].

taken which could be deemed validly to affect the amount
to be charged to depreciation in connection with intra-
state business so as to affect intrastate rates, the pre-
rogative of the State to prescribe such rates, and the
jurisdiction and duty of the statutory court in consider-
ing their validity to determine the amount properly al-
lowable for depreciation in connection with intrastate
business, are not to be gainsaid. Compare *Board of Com-
missioners* v. *Great Northern Railway Company*, 281 U. S.
412. Accordingly, the court should make appropriate
findings with respect to the amount to be allowed in this
case as an annual charge for depreciation in connection
with the intrastate business.

Upon the hypotheses adopted by the statutory court,
the return to the Illinois Company was found to be inade-
quate, but what would be a proper rate of return was not
determined. In determining what is a confiscatory regu-
lation of rates, it is necessary to consider the actual effect
of the rates imposed in the light of the utility's situation,
its requirements and opportunities. As was said in
*United Railways* v. *West*, 280 U. S. 234, 249, 250, a rule
as to rate of return can not be laid down which would
apply uniformly to all sorts of utilities; "what may be a
fair return for one may be inadequate for another, de-
pending upon circumstances, locality and risk." In that
case the Court restated the general rule in the language
of the opinion in *Bluefield Company* v. *Public Service
Commission*, 262 U. S. 679, 692, 693, as follows: "What
annual rate will constitute just compensation depends
upon many circumstances and must be determined by
the exercise of a fair and enlightened judgment, having
regard to all relevant facts. A public utility is entitled
to such rates as will permit it to earn a return on the
value of the property which it employs for the convenience
of the public equal to that generally being made at the
same time and in the same general part of the country

on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

It is evident that in the present case we are not dealing with an ordinary public utility company, but with one that is part of a large system organized for the purpose of maintaining the credit of the constituent companies and securing their efficient and economical management. The record of the Illinois Company shows that for many years it has been able to expand its business so as to meet increasing demands, to pay its operating expenses including interest on money borrowed, to pay dividends of eight per cent. upon its capital stock, and to accumulate a surplus. It was found by the court that the reduction in revenue caused by the rates in question, as applied to the entire business for the year 1923, would amount to about $1,700,000, and the question is whether the loss when ascertained with respect to the intrastate business would cause confiscation under the applicable standard as above set forth in the *Bluefield* case, *supra*. In order to determine this question, the court should find the rate of return which was realized from the intrastate business and the rate of return which it is fair to conclude would have been realized from that business under the prescribed rates.

The conclusion reached by the court as to confiscation had particular reference to the evidence bearing upon the business of the year 1923. The court said that this finding applied "with increasing force to the succeeding

years." But no findings were made as to the value of the property and the revenues and expenses in these years. A rate order which is confiscatory when made may cease to be confiscatory, or one which is valid when made may become confiscatory at a later period. *Des Moines Gas Company* v. *Des Moines*, 238 U. S. 153, 172, 173; *Lincoln Gas Company* v. *Lincoln*, 250 U. S. 256, 268, 269; *Brush Electric Company* v. *Galveston*, 262 U. S. 443, 446; *Bluefield Company* v. *Public Service Commission, supra.* In view of this fact, and as the disposition of the amount withheld by the Company under the conditions of the interlocutory injunction will depend on the final decree, there should be appropriate findings as to the results of the intrastate business in Chicago and the effect of the rates in question for each of the years since the date of the Commission's order.

In order that the necessary findings may be made, and such additional evidence as may be required for that purpose may be received, the decree is set aside and the cause is remanded to the District Court, specially constituted as provided by the statute, for further proceedings in conformity with this opinion, the restraining order entered in this suit to be continued pending further action of the District Court.

*It is so ordered.*