## COMMUNITY NATURAL GAS CO. v. ROYSE CITY et al.

### No. 3407—661.

District Court, N. D. Texas, Dallas Division.

June 14, 1934.

Karl F. Griffith, Roy C. Coffee, Marshall Newcomb, and Robertson, Robertson & Payne, all of Dallas, Tex., for complainant.

Mike Reinhardt, of Royse City, Tex., and Homer D. Stimson and Carl G. Miller, both of Rockwall, Tex., for respondent Royse City.

James V. Allred, Atty. Gen., for Railroad Commission of Texas.

ATWELL, District Judge.

In the summer of 1926 the complainant's gas distribution system was installed at Royse City. The highest number of meters that have ever been in use since that date is 305. At the present time there are 297. At the time of such installation a contract between the complainant and the respondent city became an ordinance, of date May 14, 1926, which fixed a gross charge for domestic gas at 75 cents, which became a net of 67½ cents, with a 50-cent service charge. Under this the complainant operated for a number of years. Some dissatisfaction in the city ripened into an effort by the council to reduce the rate, whereupon the complainant sought to have the rate increased. The conflict finally reached the Railroad Commission of Texas, which held a hearing and finally approved the rate under which the parties had been operating since the beginning of business.

The question presented is the validity, under the Fourteenth Amendment, of the rates so prescribed.

It should be stated here that, under the statutes of Texas, the Railroad Commission of Texas has original jurisdiction in towns of less than two thousand population, and Royse City falls within that class, to regulate gas rates; that the commission in its hearing which resulted in the order of December 30, 1932, considered the reasonableness of a contract between the Lone Star Gas Com-

pany and the Community Natural Gas Company for the furnishing of the natural gas that the complainant sold to the city, and determined that the 40 cents per thousand cubic feet that the Lone Star received was excessive and fixed a proper charge as 32 cents.

■ Considering this particular feature of the controversy first, we find that the sale, transportation, and delivery of natural gas from one state to distributors in another state is interstate commerce, and the rates to be charged therefor are not subject to state regulation. State Corporation Commission of Kansas v. Wichita Gas Company et al., 290 U. S. 561, 54 S. Ct. 321, 78 L. Ed. 500. But, where a corporation selling natural gas locally purchases its supply by agreement in interstate commerce from a pipe line company with which it is so affiliated that the two are not at arm's length in their dealings, the reasonableness of the interstate price is subject to be inquired into by state authorities when applied to by the local company for permission to increase its local rate. Smith v. Illinois Bell Telephone Company, 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255; Western Distributing Company v. Public Service Commission of Kansas, 285 U. S. 119, 52 S. Ct. 283, 76 L. Ed. 655. It must be borne in mind that the relations of affiliated corporations engaging in this sort of business are the sole ground upon which this inquiry as to reasonableness of such cost may be made.

The Lone Star Gas Company is a separate corporation and separately operated. It controls and operates approximately five thousand miles of pipe, taking gas from approximately thirty fields in distant points of Texas and Oklahoma. The complainant in this cause is wholly a distributing company, buying the gas that it distributes from the Lone Star Gas Company. Mr. Chase is an officer in both companies, and the Lone Star Gas Corporation owns the controlling stock of both.

This suit, therefore, involved a presentation of testimony tending to exhibit the value of the complainant's property and its operating expenses, as well as the property and expenses of its affiliate, the Lone Star Gas Company.

An exhibit prepared from the books of the Community Natural Gas Company by an expert shows a book cost of the Royse City plant to be $43,301.74. The testimony shows that the original cost was a little over $41,-000. Figures prepared by another company expert from the books and by figuring averages and from inspections of the property gave a valuation of $54,848.16. This was also called the reproduction cost new as of June 1, 1934. The same witness fixed the present value at $49,539.05, in which was included a cost of business development, theoretical, of $3,450, which gave the basis of $46,089.05 which the complainant is now asking to be considered in fixing its return. This figure is approximately $5,000 in excess of what the plant cost originally. I do not see, after a careful examination of the replacements and betterments and additions, any ground for disregarding the patent fact that there must be some depreciation figure before the present value can be arrived at.

■ We are instructed by the Chief Justice in Los Angeles Gas & Electric Corp. v. R. R. Commission, 289 U. S. 288, 53 S. Ct. 637, 77 L. Ed. 1180, in making a judicial ascertainment of values for the purpose of deciding whether rates are confiscatory, to consider the actual cost as a relevant fact but not as an exclusive or final test, the time and circumstances of the outlay and the effect of altered conditions, the cost of reproducing the property, and a consideration of all relevant facts. It is to be borne in mind that a public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country, on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. Bluefield Water Works & Improvement Company v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176. In Smith v. Illinois Bell Telephone Company, 282 U. S. 133, 51 S. Ct. 65, 73, 75 L. Ed. 255, it was added, that "the return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." It was in that case that it was stated that a rate of return may be reasonable at one time and too high or too low at some other time. "Going value" is included in a base for determining whether rates are confiscatory, but not good will. The concept of "going value" is not to be used to escape rate fixing authority; but, on the other hand, "that authority is not entitled to treat a living organism as nothing more than bare bones."

The testimony has not been taken to expose the size of the complainant, its investment, property values, nor expenses. Testimony has been taken which shows that Royse City is a part of a distributing district in which there are a number of other small towns; that this district is called the Garland district; that the offices and general headquarters for that particular district are maintained at Garland; that efficient service is given the people of Royse City in both the matter of gas at a pressure that is satisfactory and workmen to keep the line and system in good condition. An agent is stationed at Royse City who collects the monthly bills and who turns the gas on. All repairs are made by workmen out of the Garland headquarters.

Figures were offered by the same company experts tending to show the total value of the used and usable properties of the Lone Star Gas Company to be approximately seventy millions of dollars, with a total direct structural cost of approximately fifty millions of dollars, and a total annual accrual of $3,465,123.36.

The only direct figures as to the Royse City values were, as above stated, the original cost. The cost of operation, the cost of maintenance, the cost of betterments, and the cost of such items as are ordinarily chargeable to a utility of that sort, were arrived at by the experts through allocation in and consideration of all the units in the Garland district. These figures contain some duplications, I think. For instance, the item of tools. The same tools would be used for digging a ditch and for putting pipes in up to the property line of the consumer and in making the connections via ditches to the wholesale seller. The estimates that were made of $5,438.50 and $4,434.00, respectively, for collateral construction costs and nonphysical values were largely speculative and in no instance supported by the books of the complainant. Cash working capital and cost of business development were the items going into the nonphysical values, while preliminary and organization expenses, engineering supervision, administration and legal expenses and interest during construction made up the items of collateral construction costs. The testimony showed that a deposit of $10 was required from the consumer. These deposits drew an item of interest and they furnished working capital, and, while the items that the expert has included in these two particular subdivisions may be properly classed as chargeable under certain circumstances, they are hardly appropriate here. I am unable to see how any optional charge for legal expense can be included on the general ground that litigation or attorneys' services are ordinarily necessary. Somewhat milder criticisms, I think, are submitted with reference to the charges as to labor. It is quite possible that labor receives a higher remuneration to-day than it did in 1926, but the testimony shows that, when this plant was constructed, there were about two hundred other plants being constructed and highly organized and efficient labor was in use. These general observations tend to support the valuation of the property as in the neighborhood of $40,000, from which must be taken a reasonable depreciation. The testimony shows that some of the pipe was painted and some of the pipe was wrapped; that the most of the pipe was steel pipe and a small consignment was cast iron; that the soil of Royse City supported elements that attacked the pipe, in some degree at any rate. The effort of one expert to maintain the perfection and almost as good as new condition, while another expert, out of the same atmosphere, maintains that a plant of that sort must be permitted to set aside for reasonable and logical deterioration each year and use that item in fixing rates, require us to view with care the resultant figures.

Bearing in mind what I have said as to the absence of direct supporting figures as to cost and operating expenses, save as it may be gathered from allocations thought to be satisfactorily supported by percentage averages for the entire current district, we now pass to the matter of operating revenues. For the twelve months ended December 31, 1931, the total revenue was $13,502.24, while the expenses, ascertained as above indicated, were $11,101.34, leaving a balance for depreciation, taxes, and return of $2,400.90. For the twelve months ended December 31, 1932, operating revenues totaled $12,479.10, and operating expenses were $11,233.31, leaving a balance of $1,245.79. For the same period ended December 31, 1933, the revenues were $9,855.47, and the expenses were $9,765.65, leaving an available balance for depreciation, taxes, and return of $95.82. For the twelve months ended April 30, 1934, the revenues were $9,697.82, while the expenses were $9,877.76, which shows a deficit of $179.94 with nothing for depreciation or taxes or return. In each of these compilations the large item of expense is gas purchased. It amounted to $6,259.42 for the twelve months ended April 30, 1934, to $6,315.02 for the twelve months ended December 31, 1933, to $7,140 for the twelve months ended December 31, 1932, and

484

to $7,281.60 for the twelve months ended December 31, 1931. These purchases were on the bases of 40 cents per thousand cubic feet. The Railroad Commission of Texas found that 32 cents was a proper return for such sale. The gas cost the Lone Star Company from 2 to 10 cents at the wells. Some point has been made that the Community purchases from the Lone Star Gas Company at high pressure, while it in turn sells to the customer at a pressure of from four to five ounces above atmospheric pressure. It is explained by the company that at the bases of purchase the pressure is really figured at eight ounces, and that the difference in the pressure at which it purchases and at which it sells amounts to practically nothing when the interest of the customer is considered in the matter of saving equipment and preventing leaks. But, if we reduce the price of gas, which I do not do, from 40 to 32 cents, there is still an insufficient revenue to guarantee a satisfactory rate of return to prevent a legal confiscation, if we accept as substantially true the figures arrived at for the Royse City unit by allocating it with all of the other units in the Garland district.

The question naturally arises, though, whether the comparative insignificance of the Royse City unit when viewed beside the vast holdings of the Community Natural Gas Company, to say nothing of the holdings of the Lone Star Gas Company, would really be confiscatory. We really wonder if confiscation would rather be theoretical than actual. The fact is that the service is being given to Royse City at a slight excess of $11 per annum per customer, when under the testimony an annual charge of as much as twelve or thirteen or fourteen dollars might be reasonably allowed.

Therefore the chancellor, the equity dispenser, sees in the controversy a tempest in a teapot—really nothing on either side to justify the expense that has been incurred through eighteen months of this litigation. Splendid attorneys upon both sides have prepared this case with care and precision and have expended learning and ability in presenting their respective sides, and yet, when it is all said and all exposed, it is doubtful whether the alleged confiscation that is taking place at Royse City is not largely theoretical, and that the complaint of the Royse City people, through their officers, is, in reality, a complaint that is hardly justifiable.

But, if we must be driven to a decision of the cause, it must be concluded that there are no sufficient earnings upon the invested amount at the present rate.

If we accept as a fact a present value of $40,000 a 7 per cent. return would be $2,800. If we make the gas purchases from the Lone Star Gas Company 30 cents instead of 40 cents, that would be a deduction of approximately $1,600 in each year's operating expenses, and, if we add that amount to the balances that are shown to be available for depreciation, federal taxes, and return at the expiration of each of the twelve months' period mentioned above, we will fall short of an 8 per cent. return. I do not believe that an 8 per cent. return would be upheld. I believe that the decisions drive one to the conclusion that 9 or 10 per cent. even is not only justifiable but permissible in some causes. In the Fort Worth Gas Company v. City of Fort Worth, 35 F.(2d) 743, decided by this court in 1929, it was held that a net return for compensation to the gas company of 7 per cent. of the value of its physical property was not, as a matter of law, confiscatory, in view of the favorable situation of the company as found by the Railroad Commission and the master in chancery.

A decree may be submitted for the complainant permanently enjoining the respondents from interfering with it in the promulgation and collection of a reasonable rate at its Royse City distributing plant.