## CARY v. CORPORATION COMMISSION OF OKLAHOMA et al.

No. 1626.

District Court, W. D. Oklahoma.

Dec. 7, 1936.

See, also, 9 F.Supp. 709.

Streeter B. Flynn, of Oklahoma City, Okl. (Rainey, Flynn, Green & Anderson,

of Oklahoma City, Okl., on the brief), for complainant.

J. B. A. Robertson, of Oklahoma City, Okl. (S. J. Gordon, of Oklahoma City, Okl., and W. T. Jeter, of Mangum, Okl., on the brief), for Corporation Commission.

Before McDERMOTT, Circuit Judge, and WILLIAMS and VAUGHT, District Judges.

McDERMOTT, Circuit Judge.

Defendants move to dismiss this bill to set aside a rate order and enjoin its enforcement, on two principal grounds. To understand the motion, the peculiar situation in Oklahoma must be stated.

■ The Constitution of Oklahoma provides for an appeal from the Corporation Commission to the Supreme Court of Oklahoma, which hears the case on the record before the Commission; the court then approves the order or enters such other order as it finds proper in the premises. Article 9, §§ 20, 22, 23, Oklahoma Constitution. From the beginning down until about a year ago, the Supreme Court held that its review was not judicial, but the last step in the rate making process. City of Poteau v. American Indian Oil & Gas Co., 159 Okl. 240, 18 P.(2d) 523, and cases there cited. The federal courts, including the Supreme Court, following the Oklahoma court's construction of its own Constitution, so treated the review. Oklahoma Gas Co. v. Corporation Commission, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659; Oklahoma Gas & Electric Co. v. Wilson & Co. (C.C.A. 10) 54 F.(2d) 596. In 1933, in Swain v. Oklahoma Railway Company, 168 Okl. 133, 32 P.(2d) 51, the Supreme Court held that the district courts of Oklahoma had no jurisdiction over rate orders of the Corporation Commission. It followed that there was no judicial review of such orders afforded by the state laws. Accordingly, this court took jurisdiction of this suit, the Johnson Act (28 U.S.C.A. § 41(1, 1a), stripping the federal courts of jurisdiction only where a "plain, speedy and efficient" judicial review was afforded in the state courts. This holding was challenged and affirmed in the Supreme Court. Corporation Comm. v. Cary, 296 U.S. 452, 56 S.Ct. 300, 80 L.Ed. 324.

The Supreme Court of Oklahoma then, in October, 1935, overruled all its earlier decisions and held that it reviewed rate orders judicially. Oklahoma Cotton Gin-ners' Ass'n v. State, 174 Okl. 243, 51 P. (2d) 327.

In 1934 the order here challenged was affirmed by the Supreme Court of Oklahoma. Carey v. Oklahoma Corporation Commission, 168 Okl. 487, 33 P.(2d) 788. Defendants now move to dismiss upon the ground that such affirmance is res judicata of the issues here presented. The argument is that while every one supposed in 1934, including the Oklahoma Supreme Court, that the order was under legislative review only, that more than a year later it was discovered that the review was judicial; that by the last pronouncement it is declared that the long line of former decisions were never the law, but simply mistaken expositions of the law.

We cannot accede to an argument leading to such a shockingly unjust result. In 1934 every one supposed that the court review was legislative. The Oklahoma court had repeatedly · so held, as had the federal courts. That being so, plaintiff had no right to appeal to the Supreme Court of the United States from such legislative order. Federal Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. It had no right to remove an administrative proceeding to the federal courts. Ex parte State of Oklahoma (C.C.A. 10) 37 F.(2d) 862. These are valuable rights of which a citizen cannot be deprived by retroactive decisions after time has run on their exercise. If plaintiff had undertaken to appeal, in 1934, to the Supreme Court of the United States the appeal would necessarily have been dismissed, as the Supreme Court cannot hear appeals from legislative orders. The case is an apt one to apply the doctrine that the federal courts will look to the law of the state as it was declared to be at the time the transaction arose.

The other point in the motion to dismiss is not dissimilar. Conceding that this court had jurisdiction of this case at the outset, it is claimed that jurisdiction is lost by the recent decision of the Supreme Court holding its review judicial. The argument is that the decree entered herein will speak only to the future, and that now there is a judicial review in the state courts. But the decree will set aside an order entered at a time when there was no judicial review provided. And, as in the first ground, that review was first provided after it was too late for plaintiff to avail itself of it. The same point was pressed

on the Supreme Court of the United States on the first appeal in this case and found to be without merit.

The motion to dismiss should be denied.

■ Plaintiff in turn insists that the rate order should be set aside, even if compensatory, because the state afforded no adequate judicial review when the order was entered; and that even the review now afforded is not adequate, in that the plaintiff may not introduce additional evidence before the court on the issue of confiscation. Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908. It is argued that there can be no claim of confiscation until the rate order is entered at the conclusion of the hearing before the Commission. Baltimore & O. R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209, decided by the Supreme Court of the United States on May 18, 1936. But in every rate hearing, the question of confiscation is in the background; the utility offers evidence of the value of its properties, its expenses, etc., all pertinent on the issue of confiscation. When the appeal to the state Supreme Court is had, the claim of confiscation can be formally made, thus laying the foundation for an appeal to the United States Supreme Court. While the Oklahoma court has said it would not hear additional evidence, it has not yet refused, so far as we are advised, to send a case back to the Commission where the utility makes known its desire and ability to offer competent evidence which it was unable to present to the Commission on the first hearing. The Supreme Court has that power, perhaps by article 9, § 22, of the Oklahoma Constitution; if not, then inherently. So it is not clear that the judicial review now afforded is not adequate.

That, however, is beside the point. When this order was entered, no judicial review of any kind was afforded by the state. Does it follow that every order of the Commission is automatically void? Must a federal court of equity vacate every order made by the Commission, however fair and reasonable it may be? In the hearing on the temporary injunction we held otherwise, saying that we would not lend our aid until the plaintiff established its allegations that the order was confiscatory. Although pressed so to do in the briefs, the Supreme Court on appeal took no issue with our ruling in that regard.

■■ This brings us to the merits. The voluminous evidence was heard by an able master, Honorable George M. Nicholson, formerly Chief Justice of the state, by agreement. He has suggested findings of fact, but where exceptions are taken, we have accorded no presumption of correctness to his findings. This is because there is a stronger presumption that the findings of the Corporation Commission are correct; hence we have gone to the proof in each instance to ascertain whether there is substantial evidence to support the finding of the Commission; and if there is, we have not disturbed it. Proper respect for a co-ordinate branch of the government requires that clear and convincing proof should be adduced that its orders deny constitutional right before a court should interfere.

1. The Rate Base. There are but three points of disagreement as to the rate base. In two of them, we find the plaintiff has not carried its heavy burden. Without reviewing the recent cases on going concern value, it is enough to say that the proof here that the Commission's valuation excluded such allowance is not clear. It was not allowed as a separate item, but the properties were valued as a going concern. Without a gas field at one end and a market at the other, a gas pipe line is junk and of little value. The line here was valued as an operating profitable business. The period of construction was short; depreciation, upkeep, and return during that period is not shown and must be negligible. Plaintiff's customers were few, as it sold in bulk and not to consumers, so there was no appreciable cost to attaching business, compiling records, training personnel, etc.—items of value which must be capitalized or lost.

Taxes during construction are ordinarily part of the rate base, but under the peculiar Oklahoma statute, construction work is not taxed except perhaps during a part of the year. No taxes were paid here. We therefore sustain defendants' exceptions as to going concern value and taxes during construction.

■ The Commission did err, however, in finding that the transmission line was worth only what it would cost a contractor to build it, excluding any amount for contractor's profit, his liability and com-

pensation insurance, his risks of bad weather, overhead, etc. The evidence is undisputed that lines like this are built on contract, except perchance for one or two great companies who own their own diggers, tractors, equipment, and have and keep busy a force of pipeline layers. It is undisputed that it is cheaper for the ordinary company to let the work on contract, and that it is customarily so done in Oklahoma. This line was laid by contract in 1925. The amount of the proper allowance for such overhead is undisputed —about 20 per cent. on labor costs, which in this case is less than 4 per cent. of the entire cost. The Commission's assumption that the agreed figure represents retail cost, and therefore includes the profit, is unwarranted, for the profit is only computed on labor, and the evidence is abundant and uncontradicted that the figure allowed is at least no more than the actual cost to the contractor. The company here, as is customary, furnished the pipe to the contractor, so he had no chance to profit on its purchase. The contractor must be compensated by this allowance, or get nothing for his overhead, his risk, and his insurance. If the cost had been computed on the basis of the company doing the work itself, the proof is undisputed that the value of the line would be more. It is as unreasonable to disallow this item as to disallow the similar item in building construction, which courts and commissions uniformly allow.

Applying the lowest percentage figure disclosed by the evidence to the labor cost alone, we have $17,389.86. Working capital in the amount of $6,538.50, and material and supplies in the amount of $11,576.65, have been agreed upon. The defendants use the figure of $522,000 as a rate base. To this we think should be added the item for contractor's overhead and profit, in the sum of $17,389.86. For convenience, we use $540,000 as a rate base.

2. Operating Expenses. Federal and State Income Taxes. The Commission in its order allowed federal income taxes as a part of operating expense, but for some undisclosed reason declined to allow state income taxes. On review, the Supreme Court of Oklahoma held both should be allowed. Counsel for the Commission now take the position that neither should be allowed. The company is heavily indebted, its bond interest is high, and its net income is small because of the vicissitudes of the business. The result is that under the present rates, it pays no income tax. But its bond interest is not charged as a part of the operating expense, and if the company were able to earn a fair return on its properties used in the public service, it would have to pay federal and state income taxes of approximately $5,200.00. We think the Commission and the Supreme Court were right, and that this is a proper item of operating expense. The Supreme Court of the United States so held in Galveston Elec. Co. v. Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678. The rate which is paid for natural gas ought not to be lower when furnished by a company which has a large bonded indebtedness than by one which has not.

Depreciation and Amortization. The parties have agreed that because the present gas field will be exhausted within a very few months, an amortization allowance of $17,497.19 should be charged against the production properties.

On the depreciation of the pipe line there is a controversy. The undisputed evidence is that the life of this pipe line is a little over twenty years, partly because it runs through a soil which corrodes the pipe rapidly. The Commission allowed a depreciation charge of 4 per cent. On this trial, the engineers for the company testified to the probable life of the line and that 4.95 per cent. would be a reasonable allowance for depreciation. The engineer for the Commission, who had examined the properties, did not testify on the subject, although he was on the stand. The Commission relies upon a computation made by its auditor, based entirely upon the present per cent condition of the pipe compared with its original condition, and the amount of money expended to date for replacements, and arrives at 3.85 per cent. The methods used by the auditor are at variance with the rules laid down by the Supreme Court of the United States in Lindheimer v. Illinois Telephone Company, 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182. The flaw in the auditor's computation is this: It assumes that the amount of repairs necessary the first year is a fair gauge by which the life of the pipe line can be determined. Any one who has owned an automobile realizes the error in this. Depreciation takes place much more rapidly during the later life of most physical property than in its earlier years. Moreover, a pipe line is not like the "Deacon's one hoss shay,"

which is 100 per cent. useful until it falls to pieces. A pipe line carrying gas through the countryside is no longer useful at all after it reaches a certain condition of disintegration. A pipe line which has reached a certain stage of deterioration—say a 70 per cent. condition—would have to be junked, for the cost of replacements and the danger to the public of its use would make it impracticable to use it at all. The auditor's figures would only be of value if, as a fact, the curve of depreciation of a pipe line during its entire life was a straight line from 100 per cent to zero. The truth of the matter is that the curve is close to the horizontal until the last year or so of its life when it drops off very rapidly.

The only evidence which is in accord with the Lindheimer Case develops an annual depreciation of 4.95 per cent. Until this case, the Oklahoma Commission had allowed 5 per cent. depreciation for gas pipe lines, and the Supreme Court of Oklahoma consistently and repeatedly approved. Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okl. 84, 216 P. 917; McAlester Gas & Coke Co. v. Corporation Commission, 102 Okl. 118, 227 P. 83; Homing Light & Gas Co. v. State, 130 Okl. 258, 267 P. 235.

■ Return. The Commission in its order allowed a 7 per cent. return, and the Supreme Court of the state on appeal affirmed. The only evidence in this case on the subject is that 7 per cent. would be a minimum allowance by which money could be attracted to such an investment as this. In Smith v. Illinois Telephone Company, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255, the court said that the rate of return should be one which, in that locality and in that business, would give confidence in the financial soundness of the utility and enable it to raise the money necessary to discharge its public service. The financial standing of this small gas company in Oklahoma is well indicated by the fact that its first mortgage 6 per cent. bonds are selling on the open market at $90, yielding the investor 7.69 per cent. to maturity. No utility is more hazardous than that of furnishing natural gas, for its success depends not only upon finding and keeping a market for its gas in the face of vigorous competition by electricity and coal and fuel oil, but it depends also upon the life of the gas field from which it draws its supply. That such a hazard is a real one is indicated in this case, for it is agreed that the present gas field will be exhausted in a year or so, and heavy expenditures must be immediately made to develop a new gas supply. Counsel for the Commission argue that underlying first mortgage bonds of some of the great utilities in the East are selling on a 3 per cent. basis. But this is not a great utility; it is not in the East; and the test is not what its underlying bonds will sell for, for the bonds must have a large margin of safety. In order to get money to finance extensions, some one must furnish the money for its common stock and junior securities. From our own knowledge of the financial situation in this vicinity, we can safely say that money would not be attracted from fixed obligations or farm mortgages which would return 6 per cent., to invest in the hazards of the gas business at any rate less than 7 per cent. Counsel for the Commission do not contest the allowance of 7 per cent. if a rate base is taken which is low enough to sustain the Commission's rate. Counsel insist that 5.87 per cent. is the proper allowance for return if a rate base of $522,000 is accepted, which they contend should be. But, they argue, if the rate base is increased, the rate of return should be lowered. In other words, counsel argue that the proper way to arrive at a fair return is to compute the 18 cent commission rate against whatever is found to be the true rate base; the resulting decimal, be it nothing or 10 per cent., is the proper return. We cannot accede to that method of reasoning. We accept the Commission's allowance of 7 per cent. for return, approved as it has been, by the Supreme Court of Oklahoma.

■ Allocation. Some point, not made clear to us on argument, is raised by the Commission's engineers on the allocation of the general overhead expense. The plaintiff offered to allocate general expense which cannot be apportioned directly to any one of the towns which it serves, either upon the basis of the revenue in dollars, or the amount of gas sold, or upon any other fair basis of allocation suggested by the Commission. The Commission making no affirmative suggestion, the company allocated the overhead expense on the basis of its gross revenue, which gives a lower figure than on any other suggested basis. The Commission objects to this, and as we understand it, suggests that an allocation should first be made to the state of Oklahoma, and that then there should

be added to the Oklahoma sales, the price of the gas which it pipes into Kansas, without giving credit for the proceeds of the gas when sold in Kansas. It may be that we have misunderstood the argument, for counsel for the Commission frankly did not quite understand the engineer's point themselves. At any rate, the accepted method of allocating general overhead expense on the basis of gross income is obviously fair, and we accept that method.

3. There is a slight difference in figures if three years instead of five is used as a test period. Ordinarily, the longer the test period the more stable the result. We take five years, which includes about three years actual experience since the rate order was made. But if the shorter period is taken, the result is the same.

4. Conclusion. If plaintiff is entitled to earn a 7 per cent. return, as found by the Commission and approved by the state Supreme Court, and to a depreciation allowance of 4.95 on depreciable property, which is the only figure in the evidence that follows the decision in the Lindheimer Case, its return from the rate challenged must be approximately $37,800.

Under the 18-cent rate of the Commission, its revenue would be as follows:

| | | |
|---|---:|---:|
| Sales of 402,234 M. cubic feet at 18 cents | $72,402.12 | |
| Sales in lower brackets not in issue | 51,465.29 | $123,867.41 |
| From which should be deducted | | |
| Operating expenses agreed upon | $59,451.90 | |
| Depreciation, 4.95 per cent on transmission line, $477,661.65... | 23,644.25 | |
| Amortization on production properties (agreed upon) | 17,497.19 | |
| Income taxes | 5,200.00 | 105,793.34 |
| | | $ 18,074.07 |

It is apparent that a rate which instead of yielding a necessary return of $37,800, yields less than $19,000, is confiscatory, and must be set aside.

The correctness of this result can be quickly tested by using the Commission's own rate base of $522,000, together with the Commission's own figure of 7 per cent. for return and 4 per cent. for depreciation. Its own figures would require a net return to the company of approximately $36,500. Deducting from the gross sales only the agreed operating expenses and the agreed amortization, its own figure on depreciation, 4 per cent., and income taxes approved by the Supreme Court of Oklahoma on review, would still leave a return of only

$23,000, which is more than $13,000 short of the requirements on the Commission's own figures.

Or, if we substitute the present argument of counsel for the Commission for the findings of the Commission itself as approved by the Supreme Court of Oklahoma on review, the rate is still confiscatory. We then have these figures:

| | | |
|---|---:|---:|
| Amount necessary to earn: | | |
| 6% on $522,000 | | $ 31,320 |
| Gross Sales | | $123,867.41 |
| Deduct: | | |
| Operating expense | $59,451.00 | |
| Depreciation, 3.85% | 17,720.00 | |
| Amortization of gas field | 17,497.00 | 94,668.00 |
| | | $ 29,199.41 |

This is a return of 5½ per cent., which is not enough for a small local line to live on. That rate would not enable it to raise the money to build the extensions necessary in a year or so to find the gas to supply the people of these small towns.

In short, under any system of computation, the Commission's rate is confiscatory, unless it can be said that substantially less than 6 per cent. is a fair return on the hazardous investment in gas producing and transporting properties, and that depreciation should be measured by the repairs necessary during the first years of the life of a pipe line, and that income taxes are not operating expense. These assumptions are contradicted by the evidence, and as to the rate of return and the income taxes, by the Commission's own finding and the approval of the Supreme Court of Oklahoma on appeal.