**VIRGINIA STATE CORPORATION COMMISSION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**North American Telephone Association, et al., Intervenors.**

No. 83–1136.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1983.

Decided June 18, 1984.

Rehearings and Rehearings In Banc Denied Oct. 3, 1984.

Widener, Circuit Judge, dissented and filed opinion.

Russell W. Cunningham (Donald G. Owens, Sherry H. Bridewell, Richmond, Va., David E. Blabey, Washington, D.C., Lawrence G. Malone, Albany, N.Y., Lynwood J. Evans, Phoenix, Ariz., Richard P. Rosenberry, Lawrence F. Barth, Columbus, Ohio, Lloyd N. Moore, Jr., Montgomery, Ala., Donald A. Low, Topeka, Kan., Rosemary O'Leary, Lawrence, Kan., Harris S. Leven, Jonathan L. Heller, Columbus, Ohio, Jean E. Heilman, St. Paul, Minn., Lee McCulloch, Little Rock, Ark., Jack Shreve, Benjamin H. Dickens, Jr., Tallahassee, Fla., Steven W. Hamm, Raymond E. Lark, Jr., Russell H. Putman, Jr., Columbia, S.C., Joseph I. Lieberman, New Haven, Conn., Peter J. Jenkelunas, New Britain, Conn., Janice E. Kerr, San Francisco, Cal., Gretchen Dumas, Sacramento, Cal., J. Calvin Simpson, San Francisco, Cal., Douglas N. Owens, Olympia, Wash., Steven R. Shanahan, Cheyenne, Wyo., Bruce W. Renard, Tallahassee, Fla., Diane L. McIntire, Washington, D.C., Steven M. Schur, Madison, Wis., Jon E. Kingstad, Milwaukee, Wis., Paul Rodgers, Charles D. Gray, Washington, D.C., Frank J. Kelley, Atty. Gen., Detroit, Mich., Louis J. Caruso, Sol. Gen., Don L. Keskey, John M. Dempsey, Asst. Attys. Gen., Chicago, Ill., Ronald D. Eastman, Sp. Asst. Atty. Gen., Linda Mounts, Joel B. Shifman, Charleston, W.Va., on brief), for petitioner.

John E. Ingle, Deputy Associate Gen. Counsel, Washington, D.C. (Bruce E. Fein, Gen. Counsel, Great Falls, Va., Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., on brief), for respondents.

Michael Boudin, Washington, D.C. (Leonard R. Stein, San Francisco, Cal., Raymond F. Scully, Philadelphia, Pa., Lester G. Stiel, Cleveland, Ohio, W. Preston Granbery, New York City, Earl R. Huffman, David Horn, Cincinnati, Ohio, Thomas L. Jones, John Wohlstetter, Richard McKenna, James Hobson, Albert H. Kramer, John W. Hunter, Carolyn C. Hill, Washington, D.C., Maria A. Kendro, Kansas City, Mo., on brief), for intervenors supporting respondents.

Before WIDENER, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

The controversy here presented involves an order of the Federal Communications Commission (FCC) entitled "Uniform System of Accounts and Petition for Declaratory Ruling on Question of Federal Preemption." CC Docket No. 79–105, FCC 82–581 (released Jan. 6, 1983). The order provides that, when the FCC has prescribed depreciation rates and methods for classes of property used by telephone companies, state regulation of the same matter is thereby preempted.

Petitioner, Virginia State Corporation Commission, along with multiple Petitioner-Intervenors representing regulatory agencies of other states, argues that the states' fixing of depreciation rates and accounting methods for intrastate ratemaking purposes is preempted neither by the express language of the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (1976) (the Act), nor by FCC rules explicitly governing depreciation of telephone equipment and facilities that are used interchangeably to provide both interstate and intrastate service. We agree with the FCC that its order released January 6, 1983 preempts state regulation of the depreciation rates and methods here involved, and thereby reemphasize our recognition in *North Carolina Utilities Commission v. F.C.C.*, 552 F.2d 1036 (4th Cir.1977) ("NCUC II"), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54

L.Ed.2d 154 (1977), that "FCC regulations must preempt any contrary state regulations where the efficiency ... of the national communications network is at stake...." *Id.* at 1046.

## I. *Background*

Under the current state of the telecommunications art, local telephone companies provide "telephone plant" (facilities and equipment) that serve both interstate and intrastate communications needs. Section 152 of the Act provides in subsection (a) that the statute "shall apply to all interstate and foreign communication by wire," but in subsection (b) that "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire ...." Within this framework of divided authority, the Commission's statutory mandate is a broad one, "to make available ... to all the people of the United States a rapid, efficient, Nationwide, and world-wide wire ... communication service with adequate facilities at reasonable charges...." 47 U.S.C. § 151.

In order to achieve the mandated goal, the FCC is specifically empowered under 47 U.S.C. § 220 to prescribe depreciation practices to be followed by interstate carriers.[1] At the same time, the Act recognizes the continued vitality of state regulation of intrastate service. Section 221(b) provides that "nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire ... exchange service ... even though a portion of such exchange service constitutes interstate ... communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority." Because most of the nation's telephone plant is used interchangeably to serve both interstate and intrastate telecommunications needs, the potential for conflict between federal and state regulatory action is obvious.[2]

The conflict at issue on this appeal had its genesis in two separate orders issued by the FCC in 1980 and 1981; both orders were designed to compel carriers to employ depreciation practices that more truly reflected actual depreciation rates in light of technological reality. After seven years of study, the FCC first determined in 1980 that the prior practice of "vintage year" grouping for depreciation purposes was inaccurate, and ordered that the "equal life group" method be used. *See* Docket No. 20188, 83 F.C.C.2d 267 (1980). The equal life method permitted greater precision in allocating costs of service to current con-

---

1. Section 220(b) provides that:

    The Commission shall, as soon as practicable, prescribe for such carriers the classes of property for which depreciation charges may be properly included under operating expenses, and the percentages of depreciation which shall be charged with respect to each of such classes of property .... The Commission may, when it deems necessary, modify the classes and percentages so prescribed. Such carriers shall not, after the Commission has prescribed the classes of property for which depreciation charges may be included, charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or after the Commission has prescribed percentages of depreciation, charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission....

    (g) After the Commission has prescribed the forms and manner of keeping of accounts ... it shall be unlawful for [the carrier] to keep any other accounts ... than those so prescribed ... or to keep accounts in any manner other than that prescribed or approved by the Commission....

2. This Court has already recognized that tandem use of telephone plant to serve both interstate and intrastate needs is quite common. *See North Carolina Utilities Commission v. F.C.C.*, 537 F.2d 787, 794 (4th Cir.1976) ("NCUC I"), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976) (*quoting Katz v. A.T. & T.*, 43 F.C.C. 1328, 1332 (1953)), to the effect that, "[w]ere the Commission to exercise its jurisdiction only where the telephone facilities in question were exclusively interstate in character, it would result in virtually complete abdication from the field of telephone regulation...."

sumers, and allowed more rapid capital recovery for plant having a short useful life.[3]

Thus, while the prior "vintage year" method was thought to "stifle innovation and inhibit the introduction of new technology," 83 F.C.C.2d at 281, the "equal life" method was intended to bolster the competitive market structure that the FCC sought to foster. The same 1980 order also replaced the "whole life" method of depreciation with the "remaining life" method, which allowed a carrier to recoup the full cost of plant by making corrections in useful life estimates over time. 83 F.C.C.2d at 288–90.[4]

The FCC's 1981 order provided that inside wiring in homes and businesses no longer should be treated as a capital investment to be depreciated over time, but rather as a cost to be "expensed" to current users. Again, the thrust of the rule change was to ensure that consumers actually requesting and benefitting from installed wiring pay for that benefit. By expensing the wiring, the burden of costs associated with such station connections would be placed on the causative ratepayer, and other consumers would not be forced to bear rates unduly inflated by a depreciation component for wiring services previ-

ously provided. 85 F.C.C.2d 818, 824 (1981).

The two orders were first challenged on April 30, 1981, when the National Association of Regulatory Utility Commissioners ("NARUC") filed a Petition for Clarification of the 1981 wiring order. Specifically, NARUC requested that the FCC issue a statement that the provisions of the wiring order were not binding upon state regulatory commissions insofar as intrastate communications service was concerned. The FCC responded to the petition in a Memorandum Opinion and Order of April 27, 1982, in which it concluded that in light of the relevant legislative history of the Act, "where state [accounting and depreciation] regulation is reconcilable with federal policies or rules, there is no occasion for us to override state agency actions in furtherance of legitimate state regulatory objectives."[5] 89 F.C.C.2d 1094, 1108 (1982).

In response to the FCC's opinion and order, the American Telephone and Telegraph Company filed a Petition for Reconsideration on June 7, 1982. General Telephone Company of Ohio likewise petitioned for a Declaratory Ruling that inconsistent state action was foreclosed under the Act.[6] After further pleadings and comments, the FCC reversed its earlier position

---

**3.** For example, under the "vintage year" method, all types of telephone cable installed during one year (regardless of variations in useful lives of the cables) would be classed together and depreciated over the average useful life of the group. By contrast, the "equal life" method broke plant into smaller subgroups (*e.g.*, indoor cable as opposed to underground cable) that were depreciated separately, more in keeping with the plant's actual useful life.

**4.** Under the "whole life" method, underrecovery had become a common problem, since carriers were locked into inaccurate, overly long estimates of useful life in an industry in which innovation and resulting obsolescence were the order of the day. *See* 83 F.C.C.2d at 289–90.

**5.** Writing for a 4–3 majority of the Commissioners, Secretary William J. Tricarico found that portions of the Act were geared "to achieve as much uniformity as possible without coercing any state commission to use ratemaking methods it found unacceptable." Tricarico also emphasized that the Commission had always given

"special consideration to the needs and views of state commissions in developing accounting and depreciation rules and most State commissions have chosen to follow most accounting and depreciation rules prescribed by this Commission." 89 F.C.C.2d at 1106.

Commissioners Fogarty, Jones, and Rivera issued a Joint Dissenting Statement, in which they recognized the "clear preemptive thrust" of the wiring order and refused to defer to the states on a "critical capital recovery [issue] affecting the continued viability and competitiveness of our Nation's telephone industry in providing increasingly essential interstate, as well as intrastate, facilities and services." *Id.* at 1111.

**6.** In its petition, General Telephone noted that the Ohio state regulatory agency had explicitly rejected use of the "remaining life" and "equal life group" methods adopted in the FCC's 1980 order. General Telephone therefore perceived a direct conflict between federal and state regulatory action, which would frustrate important interests of national communications policy.

in a second Memorandum Opinion and Order of January 6, 1983. C.C. Docket No. 79–105, F.C.C. No. 82–581, slip op. (Jan. 6, 1983). After it carefully resurveyed the legislative history and decisional law, and reexamined the express language of the Act, the FCC adopted the view that the most logical and reasonable interpretation of the Act "is that where the Commission prescribes depreciation rates for classes of property [and the depreciation methods to be used], state commissions are precluded from departing" from those rates and methods. *Id.* at 17, ¶ 44. In reversing itself, the FCC espoused the notion that the plain terms of section 220 of the Act appear "clearly to preempt the states in connection with depreciation expense determinations and the related accounting." *Id.* at 6, ¶ 17. Moreover, the FCC found that, even if section 220 did not possess a preemptive effect as a matter of law, the FCC's own policies and rulings would preempt inconsistent state regulatory action as a matter of federal supremacy. *Id.* at 17, ¶ 45.

Supported by numerous state and local regulatory commissions, the Virginia State Corporation Commission ("VSCC") filed a Petition for Review of the January 6, 1983 Order. VSCC alleged that preemption was required neither as a matter of law nor as a result of regulatory action taken by the FCC.

■ Relying in part on this Court's prior decisions in *NCUC I* and *NCUC II,* and relevant decisions of other Circuits,[7] we hold that inconsistent state regulation of depreciation methods and classes of property to be depreciated has been preempted by the rulings of the FCC. Because we have determined that the affirmative regulatory action taken by the FCC suffices to preempt inconsistent state action, we find it unnecessary to decide whether, as a matter of law, the language of the Act itself requires preemption.

## II. *Discussion*

■ While it is true that the Act does reserve to the states the authority to prescribe rates for intrastate telephone service, that reservation is not to be read as preserving the states' sphere of intrastate jurisdiction at the expense of an efficient, viable interstate telecommunications network. Section 152(b) of the Act does make the broad pronouncement that "nothing in [the] chapter shall be construed ... to give the Commission jurisdiction with respect to ... intrastate communication service." Section 221(b) further supports state authority by providing that the FCC shall have no jurisdiction "even though a portion of [an] exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority."

Nonetheless, the foregoing provisions are rendered against a statutory backdrop that places primary emphasis upon a "rapid, efficient, Nationwide, and world-wide" communication service.[8] Given that overriding concern, the 1983 Opinion by the FCC construing the accounting and wiring orders of 1980 and 1981 is most reasonably interpreted as valid exercise of statutory authority by the FCC, preempting inconsistent state action by virtue of the Su-

---

7. *See Computer and Communications Industry Ass'n v. F.C.C.,* 693 F.2d 198 (D.C.Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); *New York Telephone Co. v. F.C.C.,* 631 F.2d 1059 (2nd Cir.1980); and *Puerto Rico Telephone Co. v. F.C.C.,* 553 F.2d 694 (1st Cir. 1977), discussed in text *infra. Contra Southwestern Bell Telephone Co. v. Arkansas Public Service Comm'n,* 584 F.Supp. 1087 (D.C.Ark.1984) (Court holds that FCC lacked jurisdiction to

issue the January 6, 1983 Order and refuses to enforce it as *ultra vires* ).

8. 47 U.S.C. § 151. *But see Southwestern Bell Telephone Co. v. Arkansas Public Service Comm'n,* 584 F.Supp. 1087, 1089 (D.C.Ark.1984) (holding that FCC lacked jurisdiction to issue the January 6, 1983 Order, the Arkansas District Court refuses to permit FCC's mandate to provide efficient, nationwide service to "allow the

premacy Clause.[9] While VSCC and Petitioner-Intervenors argue that "§ 221(b) has been given an unduly narrow interpretation in recent years,"[10] we do not view as "narrow" an interpretation which recognizes that the Act does not sanction a "state regulation, formally restrictive only of intrastate communication, that in effect encroaches substantially upon the Commission's authority" over interstate telecommunications. *NCUC I*, 537 F.2d at 793.

Such a finding comports well with the recent Supreme Court decision in *Fidelity Federal Savings & Loan Co. v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The court stated in *de la Cuesta*, that "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when ... state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.*

at 153, 102 S.Ct. at 3022 (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).[11] Although the holding in *de la Cuesta* arose in the context of the Home Owner's Loan Act of 1933, 12 U.S.C. § 1461 *et seq.* (1982), the basic analysis applies to this appeal as well: an appellate court is not to focus narrowly on Congress' own intent specifically to supersede state regulation. Rather, the Court must determine whether the federal agency entrusted with administering the act meant to preempt, and whether such preemptive action is within the scope of the agency's authority. 458 U.S. at 154, 102 S.Ct. at 3022.[12]

First, it is quite clear that the FCC did intend to preempt inconsistent state regulation governing depreciation methods and classes of depreciable property. The 1983 Memorandum Opinion and Order stated in no uncertain terms that "we find that this Commission's depreciation policies and rates, including the expensing of inside wir-

FCC to bootstrap itself into preempting" intrastate ratemaking determinations).

9. "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

10. Referring explicitly to this Court's decision in *NCUC I*, counsel for VSCC requested at oral argument that we "revisit" the doctrine adopted in that case, which recognized that the FCC's authority to regulate had "primacy" over state regulatory action purporting to affect the interconnection of customer-provided telephone equipment. *See NCUC I*, 537 F.2d 787, 788 (1976).

11. Construing the Federal Alien Registration Act of 1940 in *Hines*, the Court recognized that there cannot be any "rigid formula or rule which can be used as a universal pattern" in determining Congress' intention to preempt. 312 U.S. at 67, 61 S.Ct. at 404. The factual setting in which each case arises will thus shape the contours of a preemption determination.

*See also Pacific Gas and Electric Co. v. State Energy Resources Conservation Development Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 732 (1983), in which the Court again noted that preemption is proper when state law

frustrates important federal goals. In *Pacific Gas*, the Court found that agency regulations issued pursuant to the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.* (1976), did not preempt state authority to curtail the development of nuclear power for economic reasons. Because the Nuclear Regulatory Commission's regulations dealt with plant safety, while the state regulations dealt with plant economy, compliance with both sets of regulations was possible without thwarting the federal objective. *Id.* at ——, 103 S.Ct. at 1731.

12. The Court explicitly stated in *de la Cuesta*, 458 U.S. at 153–54, 102 S.Ct. at 3022:

Federal regulations have no less preemptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. *United States v. Shimer*, 367 U.S. 374, 381–382 [81 S.Ct. 1554, 1559–1560, 6 L.Ed.2d 908] (1961). When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited: "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 383, 81 S.Ct. at 1560.

393

ing, preempt inconsistent state depreciation policies and rates." C.C. Docket No. 79–105, F.C.C. No. 82–581 (Jan. 6, 1983), slip op. at 17, ¶ 45.

■ Second, the regulatory action taken by the FCC was also within its authority to ensure efficient operation of the interstate telephone network. In ordering that certain depreciation methods be followed, the FCC was merely exercising its power under section 220(b) of the Act to prescribe classes of property and percentages to be allowed as depreciation. To be sure, that prescription does have an effect on intrastate rates, but the effect will only be ancillary to the FCC's primary statutory directive to regulate interstate communications. While Petitioner VSCC would seek to prohibit even an ancillary effect on intrastate communications, such a result does not harmonize with the FCC's broader mission. As the FCC observed in *Katz, supra,* it is incumbent upon the FCC to exercise its authority in a manner best calculated to serve the needs of the public, and "[t]he fact that the same instruments are used for both interstate and intrastate services and that intrastate service is subject to state and local regulation does not alter the Commission's duties and obligations with respect to interstate telephone facilities." 43 F.C.C.2d at 1332.

Although the FCC noted in its 1982 Memorandum Opinion and Order that it had "never attempted to prevent any State commission from departing from [federal]

accounting and depreciation rules," 89 F.C. C.2d at 1106–07, the fact of the matter is that the FCC never found it necessary to do so until the current decade. During the years of monopoly power, when state commissions tended voluntarily to follow federal directives, there was no realistic need to speak in terms of preemption.[13] In the instant case, however, several state commissions refused to follow the FCC's determinations concerning depreciation. Although flexibility in depreciation practice presented little threat to the efficient operation of a monopolistic telecommunications industry, improper capital recovery does pose a true threat in today's competitive market. Thus, the FCC reasonably decided to preempt by issuing orders intended to speed capital recovery and improve accuracy of depreciation calculations, thereby enhancing competition.

■ VSCC makes much of the argument that the FCC was silent on the issue of depreciation for some forty-seven years,[14] but that prior silence does not vitiate the ongoing authority of the FCC to act once it decides that industry conditions merit preemptive regulation. As the Supreme Court observed in *Smith v. Illinois Bell,* 282 U.S. 133, 159–60, 51 S.Ct. 65, 72, 75 L.Ed. 255 (1930), a state's prerogative to regulate survives *"until* action has been taken" by a federal agency vested with jurisdiction over the matter. (Emphasis

**13.** Under section 220(i) of the Act, the FCC is required to give notice to each state commission involved, and to allow a reasonable opportunity for each commission to present its views regarding any requirements prescribed. Moreover, the FCC is required to "receive and consider such views and recommendations." Tripartite meetings were commonly held between the FCC, state carriers, and state regulatory agencies, with the FCC often able to accommodate state goals without compromising federal policy. *See* FCC Order of January 28, 1982, 88 F.C.C.2d 1223 (1982) (since late 1940s, FCC prescribed depreciation rates after conferring with carrier representatives and staffs of respective state commissions).

**14.** Indeed, the FCC itself observed in its initial Memorandum Opinion and Order of 1982 that it

was being asked "to repudiate nearly forty years of administrative practice and applicable state court proceedings by adopting an interpretation of Section 220 that would require an unwilling state commission to follow all accounting and depreciation methods prescribed by this Commission. A very compelling showing would be required to persuade us to follow such a course." 89 F.C.C.2d at 1107.

Nonetheless, since the FCC "is not barred from overruling past precedents when it decides that a previously declared rule is no longer sound or appropriate," *New York Telephone Co. v. F.C.C.,* 631 F.2d 1059, 1065 (2d Cir.1980), certainly it should not be bound to maintain silence once it determines that articulation of a uniform federal policy is warranted.

added).[15] Supporting the FCC's decision to regulate is the consideration that a full seventy-five percent of all investment in new plant falls within the intrastate services category. If that large amount of equipment investment should fail properly to reflect its true, rapid depreciation, interstate service would then suffer the effects of delayed innovation.

As noted above, decisions of other Circuits have recognized the necessity for federal preemption of inconsistent state telecommunications policy. In *Computer and Communications Industry Ass'n v. F.C.C.*, 693 F.2d 198 (D.C.Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983), it was found that state tariffing of customer premises equipment ("CPE") "must necessarily yield to the federal regulatory scheme." *Id.* at 214. The federal scheme required that charges for CPE (*e.g.*, home computer terminals, data processing units) be separated from ordinary transmission service charges. Since CPE is used interchangeably for both interstate and intrastate service, such a decision would have a clear ancillary effect on intrastate rates. Nonetheless, the Court refused to perceive any distinction between the preemption principles to be applied in the case of state ratemaking issues, and those applicable to other state powers. *Id.* at 216. Thus, ancillary effect on intrastate rates was permitted in order to achieve the federal goals of unfettered CPE selection, market competition, and a greater number of equipment and payment options.

The Court in *Computer and Communications Industry* relied in large part on this Circuit's decisions in *NCUC I* and *NCUC II* to support preemption. In *NCUC I*, we held that state regulation that "encroaches substantially" upon federal authority was preempted. 537 F.2d at 793. The conflict in that case dealt directly with policies concerning physical interconnection of non-carrier provided CPE to transmission facilities used jointly for interstate and intrastate needs. Preemption was required, even though we recognized that the FCC had no authority "over local services, facilities and disputes that in their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications." *Id.*

While it may be true that the effects of depreciation policies are more attenuated than the very direct effect produced by physical connection of equipment to interchangeable lines, it cannot be said that depreciation policies are "separable from" interstate communications. Indeed, the conduct and development of interstate communications would undoubtedly be affected by the states' imposition of depreciation policies that slowed capital recovery and innovation. *See also NCUC II*, in which we recognized the preemptive effect, or "federal primacy," of the Commission's registration program for terminal equipment subject to interchangeable use: "If it is admitted—as we think it must be—that the FCC has full statutory authority to regulate joint terminal equipment to ensure the safety of the national network, then we can discover no statutory basis for the argument that FCC regulations serving other important interests of national communications policy are subject to approval by state utility commissions." 552 F.2d at 1046–47.

The finding of federal primacy was echoed by the Court of Appeals for the Second

---

15. In *Smith*, the Court found that, in the absence of federal regulatory action "which could be deemed validly to affect the amount to be charged in connection with intrastate business so as to affect intrastate rates," the jurisdiction of the state is "not to be gainsaid" in determining depreciation amounts for intrastate telephone business. 282 U.S. at 159–60, 51 S.Ct. at 72.

*See also Northwestern Bell Telephone Co. v. Nebraska State Railway Commission*, 297 U.S. 471, 56 S.Ct. 536, 80 L.Ed. 810 (1936), in which

the Court found that pending action by the FCC to establish depreciation rates, state control over such rates remained unimpaired. The Act "contemplated no restriction of state control over depreciation rates until the [FCC] had prescribed its own rates." *Id.* at 478, 56 S.Ct. at 539.

Whereas the decisions in *Smith* and *Northwestern Bell* were predicated upon the FCC's inaction, the instant appeal presents a clear case of affirmative, preemptive action properly taken by the agency.

Circuit in *New York Telephone Co. v. F.C.C.*, 631 F.2d 1059 (2d Cir.1980), a case which involved an assertion of federal jurisdiction over local exchange service when used in connection with interstate foreign exchange services. Citing *Northwestern Bell* for the proposition that state regulation continued unabated only when the federal agency "had not yet regulated in [the] area," 631 F.2d at 1066, the Court held that once the FCC acted to impose its own tariff regulations, inconsistent state regulation was necessarily preempted.

Finally, the Court of Appeals for the First Circuit explicitly adopted the rationale of *NCUC I* in *Puerto Rico Telephone Co. v. F.C.C.*, 553 F.2d 694 (1st Cir.1977). The Court first acknowledged that federal primacy would have the "anomalous" result of ousting Puerto Rico's jurisdiction over equipment used primarily for intrastate calls. However, the Court found it "even more anomalous, in light of FCC's broad [statutory] mandate ... that § 152(b) ousts federal jurisdiction over all facilities that are also used for intrastate telephone service." *Id.* at 700.[16]

■ It is true that *Puerto Rico Telephone*, like *NCUC I*, involved a federal policy relating to physical interconnection of CPE that was nonseverable from the interstate communications system. By contrast, the instant appeal raises no question of actual physical impossibility of complying with dual federal and state regulation; presumably, the carriers could keep accounts in which assets would be separately depreciated for intrastate and interstate purposes.[17] Nonetheless, physical impossibility is but one ground for preemption; frustration of federal objectives provides a rationale at least equally valid.

Since inconsistent state regulation poses an impediment to rapid development of interstate facilities, preemption is justified in this case even if "physical impossibility" is not at issue.

In deciding the case, we have been mindful of an observation made by Chief Justice Burger when a member of the Court of Appeals for the District of Columbia in *General Telephone Company of California v. F.C.C.*, 413 F.2d 390 (D.C.Cir.1969), *cert. denied*, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). Applying the Act in the context of cable television broadcasting, Chief Justice Burger stated that "[t]he Act must be construed in light of the needs for comprehensive regulation and the practical difficulties inhering in state by state regulation of parts of an organic whole." *Id.* at 398. To be sure, practical difficulties have come to abound in this age of technological innovation since Chief Justice Burger rendered his opinion almost fifteen years ago. In response to some of the difficulties, the FCC's decision to preempt inconsistent state depreciation practices emerges as a reasonable one, designed to foster the statutory goal of an efficient nationwide telecommunications service. Our review satisfies us that the FCC's Memorandum Opinion and Order of January 6, 1983 should be

AFFIRMED.

---

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I am unable to agree that the FCC orders prescribing depreciation practices for common carriers' interstate operations require or warrant preemption of state regulation prescribing different depreciation methods

---

**16.** Section 152(b) provides, "[N]othing in this chapter shall ... give the Commission jurisdiction with respect to ... charges, classifications, or practices, services, facilities, or regulations for or in connection with intrastate communication service...."

**17.** *But see People of the State of California v. F.C.C.*, 567 F.2d 84, 86 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978). In that case, the Court observed that

requiring the maintenance of "'two redundant facilities or [investment] in expensive additional equipment' would frustrate the Commission's responsibility 'to make available, so far as possible ... a rapid, efficient, Nationwide and worldwide wire ... communications service with adequate facilities at reasonable charges,'" (*quoting* 47 U.S.C. § 151). Likewise, the expense associated with dual accounting could needlessly inflate the cost of services provided to consumers.

for carriers' intrastate operations. Such preemption conflicts with the FCC's jurisdictional limitations and with this court's reading of the Supremacy Clause in *North Carolina Utilities Commission v. FCC (NCUC I)*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976); and *North Carolina Utilities Commission v. FCC (NCUC II)*, 552 F.2d 1036, *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). The FCC properly recognized these limitations in its order of April 27, 1982, in which it specifically found that its prescription of new accounting procedures "does not preclude state commissions from using other accounting or depreciation procedures for intrastate ratemaking proceedings." *In re* Amendment of Part 31, 89 F.C.C.2d 1094, 1095 (1982), *rev'd*, CC Docket No. 79–105 (F.C.C. Jan. 6, 1983). Its order of January 6, 1983, finding that the States were preempted after all, not only violates statutory strictures on the FCC but also legal limitations on any agency making such a dramatic change in policy.

The Communications Act explicitly deprives the FCC of jurisdiction to regulate directly "charges, classifications, practices" and "facilities," among other things, for or in connection with intrastate communication service. 47 U.S.C. §§ 152(b), 221(b). Unlike other areas of the law in which the term "intrastate" has come to include virtually nothing, communication carrier accounting has until now retained a clear division between its intrastate and interstate components, and this because of the Communications Act itself. Equipment and facilities used for intrastate communications are segregated on the carriers' books from those used for interstate communications, and the States and the FCC have regulated accounting for such equipment and facilities concurrently within their respective intrastate and interstate spheres. About 75% of depreciable assets are considered intrastate. The section of

the Communications Act giving the FCC authority to prescribe depreciation practices for carriers, 47 U.S.C. § 220(b), therefore cannot be read to "require preemption" of state-imposed depreciation practices for the intrastate portion of carriers' operations. More directly put, the FCC does not have jurisdiction to prescribe directly the depreciation practices to be followed as to equipment and facilities allocated to intrastate communications.[1]

The proper analysis of this case, then, is whether the state regulation of depreciation practices as to carriers' intrastate operations conflicts with the FCC regulation of such practices for carriers' interstate operations to a degree that it requires preemption of the state regulation under the Supremacy Clause of the Constitution. This court set forth the rule in *NCUC II* that FCC regulation of facilities and equipment must preempt contrary state regulation where the efficiency or safety of the national communications network or "other important interests of national communications policy" are at stake. *NCUC II*, 552 F.2d at 1046–47. *NCUC I* and *NCUC II* involved FCC deregulation of equipment such as subscribers' telephones used jointly in interstate and intrastate communication. When the FCC rescinded its interstate tariff preventing subscribers from providing their own telephones on the ground that the tariff violated the FCC's statutory mandate to prevent unreasonable and unjustifiably discriminatory rates, *see NCUC II*, 552 F.2d at 1042; *NCUC I*, 537 F.2d at 792, some States rejoined that they could prescribe rules forbidding consumers to connect their own telephones unless the telephones were used exclusively in interstate communication. *See NCUC II*, 552 F.2d at 1043; *NCUC I*, 537 F.2d at 790. This court found that the FCC action preempted the inconsistent state regulation, since the same telephones were used in interstate and intrastate communication and since

---

1. As this court noted in *NCUC I*, "[T]he provisions of section 2(b) [47 *U.S.C.* § 152(b)] deprive the Commission of regulatory power over local services, facilities and disputes that in

their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications." *NCUC I*, 537 F.2d at 793.

state regulation prohibiting such connection would negate the federal tariff permitting such connection. *NCUC II*, 552 F.2d at 1043. "Something had to give." *Id.*

This sort of conflict simply is not present here. As this court noted in *NCUC I*, "[R]ate making typifies those activities of the telephone industry which lend themselves to practical separation of the local from the interstate in such a way that local regulation of one does not interfere with national regulation of the other." *NCUC I*, 537 F.2d at 793 n. 6.

The supposed conflict here is at least more attenuated, as the majority admits; in my view it is for all practical purposes nonexistent, and has been created by the FCC to rationalize a base for its decision. The Commission claims that if the States do not follow the FCC's depreciation methods they will frustrate the FCC's policy of "encouraging competition" where market conditions will support such a policy. The FCC's claim in essence is that its newly prescribed depreciation methods, which give the carriers more revenue in earlier years, more closely reflect economic reality and thus will increase market efficiency, encourage technological innovation, and otherwise promote competition. Even if this theorizing is correct as to the effect that the FCC's prescribed depreciation procedures for the carriers' interstate operations will have on the highly competitive interstate communications market, I cannot see how nonconforming depreciation methods for the carriers' intrastate operations can frustrate competition in the interstate communication markets within which there is competition. The only rationale I can find for the FCC's position is that the States, if not required to follow the FCC's lead, will allow the carriers less revenue from the carriers' noncompetitive intrastate operations which the carriers could use to be aggressive in the small area in which they compete with the competitive interstate carriers.[2] Besides being undesir-

able from the standpoint of the Communications Act, this fact strikes me as encouraging to the point of requiring the use of intrastate monopoly power to finance competition with the competitive interstate market, a practice as dangerous as it is unauthorized, for monopoly should depend for its existence on serving all at reasonable rates and should not be permitted to become a financing tool for competitive ventures.

Moreover, and more fundamentally, if the FCC can achieve preemption of state-prescribed depreciation methods by reciting the shibboleth of encouraging competition with as little showing of federal-state conflict as it has made here, it has effectively written 47 U.S.C. §§ 152(b) and 221(b) out of the Communications Act. It seems to me that any ratemaking changes that the carriers want can be adopted, if they can persuade the FCC that they need the money, for any FCC adoption may be imposed on the States by virtue of the Supremacy Clause on the ground that the resultant additional revenue will help the carriers in some theoretical way to compete in some market that need not even be specified, as it was not here. The logical result of this decision is to permit the FCC to abrogate completely the state regulation of intrastate ratemaking for the carriers' intrastate operations in violation of the Communications Act.

Ironically, the FCC recognized established law and practice in holding, before it reversed itself only a little more than eight months later, that

"[w]here state regulation is reconcilable with federal policies or rules, there is no occasion for us to override state agency actions in furtherance of legitimate state regulatory objectives. Section 2(b) [47 U.S.C. § 152(b) ] makes clear that Congress did not intend this Commission to foreclose state ratemaking actions unless those actions imperiled 'important interests of national communications poli-

---

**2.** I have not even considered that most of the carriers are only marginally engaged in long distance (interstate) communication, that field

being dominated by AT & T and its new found competitors.

cy....' *NCUC II*, 552 F.2d at 1047. We have found in this instance that federal regulation will not be frustrated if carriers maintain additional records for intrastate ratemaking purposes." *In re Amendment of Part 31*, 89 F.C.C.2d 1094, 1108 (1982), *rev'd*, CC Docket No. 79–105 (F.C.C. Jan. 6, 1983).

The Supreme Court requires that "an agency changing its course...supply a reasoned analysis," *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2873, 77 L.Ed.2d 443 (1983), which must include a "rational connection between the facts found and the choice made." At 2866, *citing Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). The FCC's post-hoc reinterpretation of legislative history, on which the majority here quite properly does not depend, combined with the unsupported and unsupportable statements as to the effect on competition of inconsistent state depreciation methods, do not provide even a modicum of reasoned analysis supporting the FCC's decision to interfere in state ratemaking after several decades of affirmatively espousing the opposite conclusion.

The upshot of the case is that the FCC decided that the carriers needed more revenue than the state regulatory agencies were willing to provide, so it decided to impose different depreciation rates on intrastate equipment for the very purpose of, and thus effectively, raising the intrastate rates of the subscribers [3] just as surely as if it had done so directly. I can find neither justification nor authority in the Communications Act for this action. The final irony is the FCC justification of its action on the ground that it will "...bring the benefits of competition to the ratepayers of this country." The "benefits of competition" are higher telephone bills for local ratepayers, and I feel confident that, like the man being ridden out of town on a rail,

were it not for the honor of the thing, they had rather walk.

---

**3.** Remarkable as it may seem, these facts are either expressly or implicitly acknowledged in para. 37 of the FCC order as well as other parts.

I note in passing that, as late as *NCUC I* (1976) 97% of the telephone calls in the country were local. The proportion could not be too different today.