838 F.2d 1307
 267 U.S.App.D.C. 357
 RURAL TELEPHONE COALITION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Puerto Rico Telephone Company, International Business
Machines Corporation, National Association of Regulatory
Utility Commissioners, New York Telephone Company, et al.,
North American Telecommunications Association, Municipality
of Anchorage, d/b/a Anchorage Telephone Utility, American
Telephone and Telegraph Company, MCI Telecommunications
Corporation, State of Alaska, GTE Service Corporation,
United Telephone System, Inc., Rochester Telephone
Corporation, Ad Hoc Telecommunications Users Committee,
United States Transmission Systems, Inc., National Data
Corporation, Aeronautical Radio, Inc., Pacific Bell, et al.,
Bell Telephone Company of Pennsylvania, et al., Intervenors.
MCI TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Ad Hoc Telecommunications Users Committee, et al., Intervenors.
 Nos. 84-1110, 84-1139, 85-1152.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 3, 1987.
Decided Feb. 5, 1988.
 
 William J. Byrnes, with whom Michael H. Bader, Kenneth A. Cox, John M. Pelkey, John M. Scorce, and Ruth S. Baker-Battist, Washington, D.C., were on the brief, for MCI Communications, Inc., petitioner in Nos. 84-1139 & 85-1152, and intervenor in No. 84-1110. Theodore D. Kramer, Thomas R. Gibbon, and Robert Michelson, Washington, D.C., also entered appearances for petitioner.
 Linda L. Oliver, Counsel, Federal Communications Commission ("FCC"), with whom Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy Associate General Counsel, and Laurel R. Bergold, Counsel, FCC, and Catherine G. O'Sullivan and Andrea Limmer, Attys. U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents. Barry Grossman and Nancy C. Garrison, Attys., U.S. Dept. of Justice, and Bruce E. Fein, Counsel, FCC, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Jules M. Perlberg, with whom C. John Buresh, Jonathan S. Hoak, Chicago, Ill., and Robert B. Stechert, Basking Ridge, N.J., were on the brief, for intervenor American Tel. & Tel. Co. ("AT & T") in all cases. Michael Boudin, Washington, D.C., Judith A. Maynes, New Haven, Conn., and Alfred A. Green, New York City, also entered appearances for AT & T.
 
 
 2
 David Cosson, Andrew G. Mulitz, and Margot Smiley Humphrey, Washington, D.C., were on the brief for petitioner Rural Telephone Coalition. Paul G. Daniel, Wilmington, Del., also entered an appearance for petitioner Rural Telephone Coalition.
 
 
 3
 Raymond F. Scully, Alan B. Sternstein, and Katherine I. Hall, Washington, D.C., were on the brief for intervenors Pacific Bell, et al., in all cases.
 
 
 4
 Thomas J. O'Reilly, Washington, D.C., was on the brief for intervenor U.S. Telephone Ass'n in Nos. 84-1139 & 85-1152.
 
 
 5
 Richard McKenna, James R. Hobson, and Gail L. Polivy, Washington, D.C., entered appearances for intervenor GTE Service Corp. in all cases.
 
 
 6
 Gary C. Tucker, Denver, Colo., Michael L. Glaser, and Francis E. Fletcher, Jr., Washington, D.C., entered appearances for intervenors Municipality of Anchorage, d/b/a Anchorage Telephone Utility, et al., in all cases.
 
 
 7
 Albert H. Kramer and Denise Bonn, Washington, D.C., entered appearances for intervenor North American Telecommunications Ass'n in all cases.
 
 
 8
 Joseph P. Markoski and Ann J. LaFrance, Washington, D.C., entered appearances for intervenor National Data Corp. in Nos. 84-1110 & 84-1139.
 
 
 9
 Saul Fisher, Bedminster, N.J., and John B. Messenger, Boston, Mass., entered appearances for intervenors New York Telephone Co., et al., in Nos. 84-1110 & 84-1139.
 
 
 10
 Charles D. Gray, Genevieve Morelli and William Paul Rodgers, Jr., Washington, D.C., entered appearances for intervenor National Ass'n of Regulatory Utility Comm'rs in Nos. 84-1110 & 84-1139.
 
 
 11
 Carolyn C. Hill, Washington, D.C., entered an appearance for intervenor United Telephone Systems, Inc., in Nos. 84-1110 & 84-1139.
 
 
 12
 Charles A. Zielinski and A. Richard Metzger, Jr., Washington, D.C., entered appearances for intervenor Rochester Telephone Corp. in No. 84-1110.
 
 
 13
 W. Randolph Young, Washington, D.C., entered an appearance for intervenor State of Alaska in No. 84-1110.
 
 
 14
 Joseph M. Kittner, James S. Blaszak, and Timothy J. Cooney, Washington, D.C., entered appearances for intervenor Ad Hoc Telecommunications Users Committee in all cases.
 
 
 15
 J. Roger Wollenberg, William T. Lake, and Roger M. Witten, Washington, D.C., entered appearances for intervenor IBM Corp. in all cases.
 
 
 16
 James L. McHugh, Jr., Washington, D.C., entered an appearance for intervenor Puerto Rico Telephone Co. in No. 84-1110.
 
 
 17
 John A. Ligon, Grant S. Lewis, and John S. Kinzey, Washington, D.C., entered appearances for intervenor Aeronautical Radio, Inc. in all cases.
 
 
 18
 Daniel P. Behuniak entered an appearance for intervenors Bell Telephone Co. of Pennsylvania, et al., in all cases.
 
 
 19
 Thomas J. Reiman, Chicago, Ill., and Alfred Winchell Whittaker, Washington, D.C., entered appearances for intervenors Ameritech Operating Companies, et al., in Nos. 84-1139 & 85-1152.
 
 
 20
 Mary Jo Manning, Washington, D.C., entered an appearance for intervenor ROLM Corp. in No. 84-1139.
 
 
 21
 William B. Gundling, Hartford, Conn., entered an appearance for intervenor Dept. of Public Utility Control of the State of Connecticut in No. 84-1139.
 
 
 22
 Joel B. Shifman, Charleston, W. Va., entered an appearance for intervenor Public Service Com'n of West Virginia in No. 84-1139.
 
 
 23
 Robert W. Barker and Robert B. McKenna, Washington, D.C., entered appearances for intervenor Mountain States Tel. & Tel. Co., et al., in Nos. 84-1139 & 85-1152.
 
 
 24
 Theodore D. Frank, Washington, D.C., entered an appearance for intervenor Centel Corp. in No. 84-1139.
 
 
 25
 Arthur H. Simms and Lawrence P. Keller, Washington, D.C., entered appearances for intervenor Western Union Telegraph Co. in No. 84-1139.
 
 
 26
 Kevin H. Cassidy, McLean, Va., Jeffrey Matsuura, Washington, D.C., William E. Willis, New York City, and Margaret K. Pfeiffer, Washington, D.C., entered appearances for intervenor Satellite Business Systems in No. 84-1139.
 
 
 27
 Edgar Mayfield, William C. Sullivan, Linda S. Legg, and Liam S. Coonan, St. Louis, Mo., entered appearances for intervenor Southwestern Bell Telephone Co. in No. 84-1139.
 
 
 28
 Herbert E. Marks, Ann J. LaFrance, and David A. Wormser, Washington, D.C., entered appearances for intervenor Association of Data Processing Service Organizations, Inc., in No. 85-1152.
 
 
 29
 Daniel A. Huber, Washington, D.C., entered an appearance for intervenor U.S. Telecom, Inc., in No. 85-1152.
 
 
 30
 Brenda L. Fox, Washington, D.C., entered an appearance for intervenor National Cable Television Ass'n in No. 85-1152.
 
 
 31
 Before MIKVA, BORK and BUCKLEY, Circuit Judges.
 
 
 32
 Opinion for the court filed by Circuit Judge BUCKLEY.
 
 BUCKLEY, Circuit Judge:
 
 33
 Petitioners challenge various aspects of two Federal Communications Commission orders relating to the allocation of local exchange costs between the interstate and intrastate regulatory jurisdictions. The challenged decisions are interim measures the Commission has taken as the communications industry continues to adjust to the dissolution of American Telephone and Telegraph Company's Bell System. Their effect is to shift certain costs from intrastate to interstate telephone service, with the partial objective of avoiding large increases in local telephone rates and advancing the goal of universal telephone service.* We affirm the orders.
 
 I. BACKGROUND
 
 34
 Great changes have visited the Nation's telephone system in recent years. The typical interstate call nonetheless still traces a familiar path. It originates at a home or office, proceeds to the switches of a local exchange telephone company, is connected there to an interexchange carrier, crosses state boundaries, reaches a second local exchange, and is finally connected through to the receiving party. The capital plant of local exchange companies is therefore essential to the functioning of the interstate communications system we have today.
 
 
 35
 State regulatory agencies have jurisdiction to set rates for local and intrastate telephone service. As telephone rates are generally based on the cost of providing service, it is necessary to separate and allocate the costs of operating local exchanges among the intrastate and interstate jurisdictions before state and federal agencies, respectively, can set rates. See Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930); MCI Telecommunications Corp. v. FCC, 750 F.2d 135 (D.C.Cir.1984). Thus, separating costs between the two jurisdictions has the incidental effect of defining the rate base of telecommunications carriers.
 
 
 36
 This case concerns part of the Commission's attempt to use its power to allocate costs between federal and state jurisdictions in order to cushion the transition to a competitive long-distance communications market. The conversion must be cushioned because during the period American Telephone and Telegraph Company ("AT & T") was divesting itself of the Bell Operating Companies ("BOCs"), see United States v. AT & T, 552 F.Supp. 131 (D.D.C.1982), aff'd mem. sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), the Commission determined that the Bell System had operated with wide disparities between the prices BOCs charged for local service and their operating costs.
 
 
 37
 Local company costs include certain "non-traffic sensitive" ("NTS") costs. These do not vary with the volume of calling traffic. The capital plant from which they arise is the line from the customer's premises to the local exchange company's central office (the "subscriber loop"), related "customer premises equipment" ("CPE") such as ordinary hand sets and customer wiring, and part of local exchange companies' central office switching equipment.
 
 
 38
 After extensive studies in which it considered various options for eliminating the disparities between local company NTS costs and local customer bills, the Commission concluded that imposing "access charges" on subscribers to recover NTS costs would be the most economically efficient long-term solution. See MTS & WATS Market Structure, 93 F.C.C.2d 241 (1983) ("Access Charge Decision "), recon., 97 F.C.C.2d 682 (1983), aff'd in principal part sub nom. National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095 (D.C.Cir.1984), cert. denied, 469 U.S. 1227, 105 S.Ct. 1225, 84 L.Ed.2d 364 (1985) ("NARUC"). As the Commission also determined that an immediate transition to such flat charges might cause some subscribers to forgo telephone service, it settled upon an interim policy consisting of (1) relatively low initial flat charges beginning in June 1985, and (2) recovery of the balance of NTS costs through usage-based charges. See NARUC, 737 F.2d at 1107-10.
 
 A. Non-Traffic Sensitive Cost Allocation
 
 39
 The principal issue in this case is whether the Commission properly allocated twenty-five percent of NTS costs to interstate jurisdiction, to be phased in over an eight-year period. The choice of the particular level of allocation, twenty-five percent, is related to changes that have occurred in the communications industry since 1970. In that year the FCC adopted the "Ozark Plan" to allocate NTS costs between the interstate and intrastate jurisdictions. Under the Ozark Plan, NTS costs were assigned to the interstate jurisdiction at the rate of approximately 3.3 times the proportion of interstate use. See MCI v. FCC, 750 F.2d at 137.
 
 
 40
 The Commission refers to that calculation as the "subscriber plant factor" or "SPF." As the proportion of interstate use increased sharply after 1970, the SPF caused NTS costs assigned to the interstate jurisdiction to increase more than three times as fast. The Commission therefore decided, in 1982, to "freeze" at approximately twenty-six percent the proportion of NTS costs allocated to interstate use. We affirmed the freeze order in MCI v. FCC, 750 F.2d at 141, as an interim measure pending fuller resolution of the NTS cost problem.
 
 
 41
 In 1980, the Commission referred the cost allocation problem to a Federal-State Joint Board ("Board") for study and recommendations. Three years later, in Joint Board I, supra n. *, the Board recommended that twenty-five percent of NTS costs be deemed interstate costs. In its First Decision, supra n. *, the Commission accepted with minor changes the recommendations in Joint Board I. Thus, although local companies' NTS costs do not increase as a result of interstate use, the Commission decided to order interstate carriers to absorb some of the cost of local service. The Commission defends its decision primarily because the Board's recommendation "approximated the existing nationwide average interstate allocation under frozen SPF," and thereby avoided "substantial dislocations in the industry [which] might have a significant impact on local rates and thus on universal service." Brief for FCC at 22-23. According to the Commission, the policy it has chosen prevents "future automatic increases" in NTS interstate allocation "under a usage-based formula such as SPF." Id. at 23.
 
 B. High Cost Apportionment
 
 42
 The Commission also determined that the twenty-five percent allocation of NTS costs to interstate jurisdiction would not sufficiently assist certain high cost local companies to maintain universal service, which is one of the Commission's charges under the Communications Act, 47 U.S.C. Sec. 151 (1982) ("For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, ... wire and radio communication service with adequate facilities at reasonable charges, ... there is created a commission to be known as the 'Federal Communications Commission',...." (emphasis added)). The Commission therefore proposes to create a federal "Universal Service Fund" ("Fund") to "ensure that telephone rates are within the means of the average subscriber in all areas of the country, thus providing a foundation on which the states can build to develop programs tailored to their individual needs." First Decision, 96 F.C.C.2d at 795. The Commission describes the high cost apportionment plan as follows:
 
 
 43
 In an effort to keep local service rates affordable to the average subscriber in all areas of the nation, the FCC adopted a high cost formula which allocates a larger percentage of the costs of high cost companies to the interstate jurisdiction. The high cost assistance plan targeted the greatest assistance to the smallest companies and the highest cost areas. As the FCC had provided in the initial Access Charge Decision, the high cost allocation would be recovered through a permanent universal service fund to be funded by usage charges contained in the rates of interexchange carriers.
 
 
 44
 Brief for FCC at 16-17 (footnotes omitted). According to the Commission, "use of the basic 25 percent interstate allocation for NTS local exchange costs would result in a slight increase in the interstate NTS allocation when combined with the additional interstate expense allocation for high cost areas." First Decision, 96 F.C.C.2d at 790 n. 19.
 
 C. Customer Premises Equipment
 
 45
 The Commission deregulated "customer premises equipment" ("CPE") in 1983. See Amendment of Section 64.702, 77 F.C.C.2d 384 (1980), recon. 84 F.C.C.2d 50 (1980), further recon. 88 F.C.C.2d 512 (1981), aff'd sub nom. Computer & Communications Indus. Ass'n v. FCC, 693 F.2d 198 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). The Commission, however, has declined to make an immediate withdrawal of CPE that is "embedded" in the rate bases of the former BOCs because it fears that doing so would cause considerable economic dislocation. Instead, the Commission has ordered a sixty-month phaseout of embedded CPE ending in December 1987. To "avoid undue economic dislocations," we approved this phase-out plan in MCI v. FCC, 750 F.2d at 142. Under review in this case is the Commission's decision to adhere to the phase-out plan even after the embedded CPE is transferred to AT & T. As the embedded CPE is transferred, the phase-out in essence requires the inclusion of CPE in the costs of local companies until December 1987, regardless of the fact that local companies do not really own CPE.
 
 D. Relative Use Traffic Study Period
 
 46
 For many years, telephone companies have been required by the FCC's Separations Manual to measure relative traffic over a "representative" period. These studies provide the basis for apportioning traffic sensitive costs and for dividing revenues among the companies. Brief for Rural Telephone Coalition at 21; Brief for FCC at 19. Before us for review is the Commission's decision to accept the Joint Board's recommendation that telephone companies be required to base their measurements on seven-day traffic study periods. In order to accomplish this goal, the Commission amended the Manual by requiring that the study periods be representative "for all traffic." First Decision, 96 F.C.C.2d at 808-09 (emphasis added); see Joint Board I, 48 Fed.Reg. at 46,572-73.
 
 E. Grounds for Review
 
 47
 Petitioners' objections concern different aspects of the two Commission orders before us. MCI Telecommunications Corporation ("MCI") focuses its attack on the Commission's acceptance of the Joint Board recommendation that twenty-five percent of NTS costs be allocated to the interstate jurisdiction. It contends that that allocation has no other purpose but the redistribution of wealth through a form of tax, and that Congress has not delegated taxing authority to the Commission even if such delegation were constitutional. MCI also argues that the twenty-five percent allocation amounts to a taking of property for public use without just compensation, in violation of the Fifth Amendment to the Constitution. In addition, MCI claims that the CPE phase-out is based on fictitious "phantom plant," and thus violates basic ratemaking principles. Finally, MCI challenges the high cost apportionment.
 
 
 48
 Rural Telephone Cooperative ("Rural") limits its challenge to the Commission's decision concerning the seven-day sampling period. Although Rural originally sought review of the Commission's determination that the Regulatory Flexibility Act, 5 U.S.C. Secs. 601 to 612 (1982), does not apply to small telephone companies, counsel for Rural moved the court to dismiss that part of the petition in No. 84-1110. As the court granted the motion, the Regulatory Flexibility Act issue is no longer before us.
 
 
 49
 For the reasons stated below, we affirm the challenged portions of the orders under review.
 
 II. DISCUSSION
 A. Standard of Review
 
 50
 As the reviewing court, we must "interpret constitutional ... provisions" ourselves. 5 U.S.C. Sec. 706 (1982). See St. Francis Hosp. Center v. Heckler, 714 F.2d 872, 873 (7th Cir.1983) ("Deference to administrative expertise does not extend to judging the constitutionality of a statute or regulatory scheme."), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). The FCC's interpretation and application of its authorizing statute, however, will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982). "This review is a narrow one; we must affirm the decision if we find that it is not contrary to law, that it is supported by substantial evidence and based upon a consideration of the relevant factors, and if we determine that the conclusions reached have a rational connection to the facts found." American Telephone & Telegraph Co. v. FCC, 832 F.2d 1285, 1291 (D.C.Cir.1987).
 
 B. Interstate NTS Allocation
 
 51
 1. Is it a Taking?
 
 
 52
 Allocating twenty-five percent of NTS costs to interstate jurisdiction in effect transfers those costs to the rate bases of interstate carriers, forces them to recover those costs through their rates, and reduces their profitability. The Supreme Court, however, has reviewed statutorily authorized economic regulation with great deference. The Court's recent decision in FCC v. Florida Power Corp., --- U.S. ----, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987), follows that pattern. In that case, the Court held that Commission regulations limiting the rate an electric utility can charge television cable operators for the use of electricity poles constitute neither a per se taking of the utility's property, nor a taking under more traditional Fifth Amendment principles.
 
 
 53
 On the per se taking issue, the Court distinguished Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), on the basis that the FCC did not require the power company to allow the cable operators to use its poles. Florida Power, 107 S.Ct. at 1112. The Court then applied the Takings Clause principle that "[s]o long as the rates set are not confiscatory, the Fifth Amendment does not bar their imposition." Id. at 1113 (citing St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 53, 56 S.Ct. 720, 726-27, 80 L.Ed. 1033 (1936), and Permian Basin Area Rate Cases, 390 U.S. 747, 770, 88 S.Ct. 1344, 1361-62, 20 L.Ed.2d 312 (1968)).
 
 
 54
 In this case, nothing in the record suggests that the Commission's allocation of twenty-five percent of NTS costs to the interstate jurisdiction constitutes a confiscation of MCI's property. Indeed, MCI cannot operate general long distance service without using the facilities of local exchange companies. The proposition cannot seriously be entertained that requiring MCI to absorb part of the NTS costs of local exchanges amounts to a confiscation. See Jersey Cent. Power & Light Co. v. Federal Energy Regulatory Comm'n, 810 F.2d 1168, 1181 n. 3 (D.C.Cir.1987) (en banc) (absent "deep financial hardship ... there is no taking").
 
 
 55
 More fundamentally, we find the facts in this case analogous to the situation confronting the Court in Florida Power, except that the parties here are inverted. In Florida Power, the television cable companies needed the utility's plant to reach their subscribers, and the utility challenged the FCC rate as a taking. Here, MCI needs local companies' NTS plant to reach its subscribers, but it is MCI that challenges the rate indirectly resulting from FCC jurisdictional action.
 
 
 56
 It is the nature of the rate action, rather than the identity of the party challenging it, that controls the decision whether the rate is a taking. Comparing the rate action in Florida Power to the probable effect of the twenty-five percent allocation on MCI's profits, we can discern no difference rising to the level of a Takings Clause objection. The Commission has attempted to balance various public and private concerns, acknowledged MCI's reliance on local company plant, and established an allocation figure which, on the average, scarcely differs from the "frozen SPF."
 
 
 57
 2. Is it a Tax?
 
 
 58
 We also find unacceptable MCI's argument that the twenty-five percent allocation is an exercise of taxing power that Congress has not delegated to the Commission, and that could not be delegated without violating the Taxing Clause, U.S. Const. art. I, Sec. 8. In Brock v. Washington Metropolitan Area Transit Auth., 796 F.2d 481, 489 (D.C.Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987), we warned that "[t]he definition of 'tax' in the abstract is a metaphysical exercise in which courts do not have occasion to engage." Rather, a regulation is a tax only when its primary purpose judged in legal context is raising revenue. Id. at 488-89. There is no reasonable way to construe the NTS cost allocation as having the primary purpose of raising federal revenue. Cf. South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 887 (4th Cir.1983) (it is not an exercise of taxing power, but of the power to regulate commerce, to exact deductions from sales of all commercially marketed milk to offset cost of milk price support program), cert. denied, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984).
 
 
 59
 As MCI has not cited any precedent holding that an agency's exercise of a power to allocate costs among state and federal jurisdictions for purposes of ratemaking is equivalent to an exercise of the power to tax, we adhere to circuit precedent and reject MCI's contention that the twenty-five percent allocation is a tax.
 
 
 60
 3. Is it a Prohibited Subsidy?
 
 
 61
 Finally, MCI contends that in enacting the Communications Act, Congress "intended to preserve the previous court decisions which interpreted the sections so transferred," Brief for MCI at 58, including Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). According to MCI, the twenty-five percent NTS allocation violates the doctrine of Smith because it is intended to create a subsidy or, in the alternative, has the effect of creating one. We have noted before that where "there is no purely economic method of allocation ... elements of fairness and other noneconomic values inevitably enter the analysis of the choice to be made." MCI Telecommunications Corp. v. FCC, 675 F.2d 408, 416 (D.C.Cir.1982). MCI relies on Smith, however, to reason that "each jurisdiction must stand independently and may not rely on the ratepayers in the other jurisdiction for support." Brief for MCI at 53.
 
 
 62
 This is not the first time MCI has attempted to convince this court that Smith requires a particular method of separating costs. See MCI v. FCC, 750 F.2d at 140-41. Smith holds only that intrastate and interstate telephone costs must be separated for jurisdictional purposes, and that such separation must be done according to "reasonable measures." 282 U.S. at 150, 51 S.Ct. at 69. MCI's construction of Smith unduly emphasizes the Court's requirement of separation at the expense of its admonition that separation must be reasonably made. In the past, we have not interpreted the separation requirement in Smith so strictly. We have held that "Smith does not constitutionally compel use of a particular formula. Smith compels 'only reasonable measures.' " MCI v. FCC, 750 F.2d at 141. See also id. at 141 n. 34.
 
 
 63
 Thus, we distinguish Smith because we view the twenty-five percent NTS cost allocation as a step on the road towards an efficient national telephone rate structure based primarily on access charges levied directly on customers. The allocation is a "reasonable measure" acceptable under Smith because it is part of a transitional process, and "[i]nterim solutions may need to consider the past expectations of parties and the unfairness of abruptly shifting policies." MCI v. FCC, 750 F.2d at 141. Moreover, as we stated in NARUC,
 
 
 64
 [t]he shift from one type of nondiscriminatory rate structure to another may certainly be accomplished gradually to permit the affected carriers, subscribers and state regulators to adjust to the new pricing system, thus preserving the efficient operation of the interstate telephone network during the interim.
 
 
 65
 737 F.2d at 1135-36.
 
 
 66
 Accordingly, we affirm the twenty-five percent NTS cost allocation as a reasonable and carefully considered element of the transition towards the access charge regime approved in the Access Charge Decision.
 
 C. High Cost Apportionment
 1. Statutory Authority
 
 67
 The Commission was established "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, ... wire and radio communication service with adequate facilities at reasonable charges...." 47 U.S.C. Sec. 151 (1982). Moreover, the Commission is authorized to "make such rules and regulations ... as may be necessary in the execution of its functions." 47 U.S.C. Sec. 154(i) (1982). As the Universal Service Fund was proposed in order to further the objective of making communication service available to all Americans at reasonable charges, the proposal was within the Commission's statutory authority. We have recognized previously that universal service is an important FCC objective. See NARUC, 737 F.2d at 1108. Cf. GTE Service Corp. v. FCC, 474 F.2d 724, 730-31 (2d Cir.1973) (Commission has authority under 47 U.S.C. Secs. 151 & 154(i) to regulate data processing activities of common carriers, which pose a "threat to efficient public communications services at reasonable prices"). Although Sec. 154(i) "is not infinitely elastic," North Am. Telecommunications Ass'n v. FCC, 772 F.2d 1282, 1292 (7th Cir.1985), the Commission's action here falls within the "expansive powers" delegated to it by the Communications Act. NBC v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 1010-11, 87 L.Ed. 1344 (1943).
 
 
 68
 Had the Commission proposed the Universal Service Fund for the purpose of subsidizing the incomes of impoverished telephone users, it would have exceeded its authority under section 154(i), as the provision of public welfare is not among its functions. Instead, the Commission explicitly (and properly) rejected "solv[ing] the problems of the poor" as an appropriate objective of the Fund, and restricted its use to the more limited purpose of ensuring that "telephone rates are within the means of the average subscriber." First Decision, 96 F.C.C.2d at 795.
 
 2. Arbitrariness
 
 69
 The Joint Board, which was established to study the interplay of state and national interests in the telecommunications field, gave the competing issues and considerations concerning the Universal Service Fund exhaustive study and presented carefully thought-out recommendations. 48 Fed.Reg. at 46,566-69. These recommendations were subjected to extensive review and comment by all interested parties, were amply discussed by the Commission, 96 F.C.C.2d at 791-802, and the reasons for the Commission's conclusions were adequately explained.
 
 
 70
 MCI nevertheless argues that the Commission acted arbitrarily and capriciously, for two reasons. First, the beneficiaries of the Fund are telephone companies, not consumers. Brief for MCI at 62-63. There is a risk, as the Commission recognized, that local companies will not use the additional interstate expense allocation to reduce local rates. The Commission concluded, however, that this risk was minimal:
 
 
 71
 the interest of state regulatory officials in keeping local rates affordable as well as the watchfulness of individual consumers and local consumer groups will ensure that this assistance is used for its intended purpose.... Furthermore, we are asking the Joint Board to monitor the future use of this assistance.
 
 
 72
 96 F.C.C.2d at 796. We find this assessment of the risk entirely reasonable.
 
 
 73
 Second, MCI argues that the financial assistance formulae are, in effect, arbitrary because they are not tied to the actual needs of the local populations. Funds are dispersed to areas in which NTS costs exceed 115% of the national average. These, however, may reflect the higher costs associated with recent expansion in boom areas. MCI also argues that the Commission's proposal may lead to the paradoxical result that some of the most affluent and rapidly developing communities (e.g., in the Sun Belt) will be major beneficiaries of the Fund; that the high cost criterion may encourage overexpansion or mismanagement; and that the aggregate costs in an area bear no necessary relation to the financial needs of local populations. Brief for MCI at 63-66.
 
 
 74
 These objections give us pause, but we are persuaded that the Commission is sensitive to the problems and intends to resolve them as they arise. As the Commission notes, 96 F.C.C.2d at 792 n. 24, the Joint Board is studying the distribution of the Fund, and will issue supplemental recommendations to the Commission if the level of support provided to any area under the current formulae is inappropriate. See Joint Board I, 48 Fed.Reg. at 46,569.
 
 
 75
 The Fund as proposed may well produce anomalous results, and there may indeed be "better" means of aiding the truly needy. Brief for MCI at 62, 63. Our task, however, is not to determine the best means, but only to decide whether the means selected by the Commission are lawful, supported by substantial evidence after consideration of relevant factors, and rationally connected to the facts. The Commission determined that the Fund would serve the statutory objective of universal service at reasonable charges, 47 U.S.C. Sec. 151 (1982). The Fund was not proposed as a welfare scheme; if it were, the Commission would have exceeded its authority. Rather, the Commission seeks to moderate excessive NTS local exchange plant costs in order to ensure that rates are within the means of the average subscriber. As an interim measure, this decision was within the Commission's discretion.
 
 D. Customer Premises Equipment
 
 76
 MCI's principal basis for challenging the Commission's decision regarding CPE is the argument that
 
 
 77
 the moment terminal equipment is deregulated and withdrawn from common carrier service, its costs must be removed from common carrier accounts. A gradual phase-out of terminal equipment costs would be completely unlawful since, during the phase-out period, regulated common carriers would be receiving a return on plant not "used and useful" in the provision of common carrier service.
 
 
 78
 Brief for MCI at 68 (citing Federal Power Comm'n v. National Gas Pipeline Co. of America, 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942), and American Telephone & Telegraph Co., 64 F.C.C.2d 1, 47 (1977)).
 
 
 79
 In MCI v. FCC, 750 F.2d at 142, we rejected a challenge by MCI to the CPE phase-out plan. That challenge focused on the Commission's decision that the immediate removal of embedded CPE from the rate bases of local companies would be unacceptably disruptive. In approving the phase-out plan, the court was fully aware of the possibility that local companies would benefit from counting CPE in their rate bases even though they did not own CPE. We emphasized that "[s]ince the FCC could deregulate all CPE today, it is unreasonable to preclude the agency from avoiding hardships by denying it the power to phase-out the regulations." Id. We see no reason to revisit this area, especially as MCI's renewed attack is premised on a doctrine of limited weight. See Jersey Central, 810 F.2d at 1175 (" 'used and useful' [has] ceased to have any constitutional significance, and the Commission has at times departed from this standard").E. Relative Use Traffic Study
 
 
 80
 Rural argues that the Commission's amendment to the Separations Manual adding the phrase "for all traffic" immediately after the words "representative period" was superfluous, as the purpose of the study had always been to achieve an accurate measurement of relative exchange usage. Furthermore, the phrase "for all traffic" does not necessarily imply a seven-day study period because for some telephone companies, a shorter period may provide a more accurate picture of relative traffic. Therefore, Rural concludes, the amendment has not effected a substantive change in the Manual, and what is deemed a "representative" period must continue to depend "on the facts and circumstances of a particular study area." Brief for Rural at 28.
 
 
 81
 In Reservation Telephone Cooperative v. FCC, 826 F.2d 1129 (D.C.Cir.1987), we accepted the Commission's interpretation of "representative period," in the old Manual, as meaning a five-day period. It is clear that the Commission's purpose in amending the Manual was to change that meaning: "We agree with the Joint Board's recommendation that seven (calendar) day studies be used as the basis for separations usage measurements. We conclude that the recommended change [the addition of 'for all traffic'] in the Manual language should be adopted to accomplish this change." First Decision, 96 F.C.C.2d at 809 (emphasis added). Rural's arguments notwithstanding, we conclude that the FCC intended the amendment to be substantive and to mandate the seven-day study period.
 
 III. CONCLUSION
 
 82
 As we find the challenged portions of the Commission's orders to be neither contrary to law nor arbitrary or capricious, we
 
 
 83
 Affirm.
 
 
 
 *
 Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board, 96 F.C.C.2d 781 (1984) (adopting most recommendations of the Federal-State Joint Board in 48 Fed.Reg. 46,556 (Oct. 13, 1983) ("Joint Board I")) ("First Decision"); MTS & WATS Market Structure, 50 Fed.Reg. 939 (1985) (released December 28, 1984) (adopting most Board recommendations in 49 Fed.Reg. 48,325 (Dec. 15, 1984) ("Joint Board II")) ("Second Decision"). See also MTS & WATS Market Structure, FCC 86-56 (released January 30, 1986) (Joint Appendix 463) ("Reconsideration Order")